# Exhibit B

ORIGINAL

1  Jeffrey K. Compton (SBN 142969)
2  MARKUN ZUSMAN FRENIERE & COMPTON LLP
   17383 W. Sunset Blvd., Suite A380
3  Pacific Palisades, CA 90272-4181
   Telephone: (310) 454-5900
4  Facsimile: (310) 454-5970
5  Email: jcompton@mzclaw.com

6
7  Jonathan Weiss (SBN 143895)
   LAW OFFICE OF JONATHAN WEISS
8  10576 Troon Ave.
   Los Angeles, CA 90064-4436
9  Telephone: (310) 558-0404
   Email: jw@lojw.com
10

**FILED**
Superior Court of California
County of Los Angeles

MAR 26 2019

Sherri R. Carter, Executive Officer/Clerk of Court
By _Brigitte De La Rosa_ Deputy
Brigitte De La Rosa

11 *Attorneys for Plaintiff and the Proposed Class*

12      **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

13            **FOR THE COUNTY OF LOS ANGELES**

14

15  CITYWIDE CONSULTANTS & FOOD          Case No.:  **19STCV10106**
16  MANAGEMENT, LLC, individually and
    on behalf of all others similarly situated,     **CLASS ACTION**
17
18              *Plaintiff,*                         CLASS ACTION COMPLAINT FOR:
    vs.
19                                                   1. VIOLATION OF THE CARTWRIGHT
20  GRUMA CORPORATION, a Nevada              ACT (Bus. & Prof. Code, § 16720 et seq.)
    corporation, dba MISSION FOODS
21  CORPORATION; SMART & FINAL           2. UNLAWFUL BUSINESS PRACTICES
    STORES, INC.; STATER BROS.            (Bus. & Prof. Code, § 17200 et seq.)
22  MARKETS; and DOES 1 through 100,
23  inclusive,
24
25              *Defendants.*
        jhl
26
27      Plaintiff Citywide Consultants & Food Management, LLC ("Plaintiff" or

28  "Distributor") alleges as follows on information and belief against Gruma Corporation,



_____

                    CLASS ACTION COMPLAINT

1   a Nevada corporation, doing business as Mission Foods Corporation (hereinafter jointly

2   referred to as "Gruma"), and Smart & Final, Inc., and Stater Bros. (collectively the

3   "Chain Stores") and DOES 1 through 100 as follows:

4

5                         **SUMMARY OF ACTION**

6       1.      Plaintiff brings this action against Gruma and the Chain Stores

7   ("Defendants") for violations of the Cartwright Act (Bus. & Prof. Code, § 16720 et

8   seq.) and the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq.) ("UCL").

9       2.      Gruma, the world's largest tortilla maker, contracts with hundreds of

10   delivery drivers to get its goods to market in California.

11       3.      To avoid employment-related expenses (such as 40-hour work weeks,

12   days off, Social Security, and disability insurance), Gruma uses an independent

13   distributor model, effectuated through a so-called "Store Door Distribution Agreement"

14   ("SDDA").

15       4.      Gruma's independent distributor model has one fatal flaw: the

16   Distributors, who buy the products from Gruma before reselling them to Chain Stores,

17   must resell the products at prices negotiated between Gruma and the Chain Stores. In

18   other words, Gruma and the Chain Stores require Resale Price Maintenance, which is

19   vertical price-fixing in per se violation of the Cartwright Act and the UCL.

20       5.      One antitrust commentator describes the fatal flaw in Defendants'

21   scheme:

> A supplier selling products or services through independent
> distributors may face a practical problem in dealing with large
> national accounts or multi-regional retail accounts. Many such
> chain dealers desire, and often require, that purchase contracts be
> negotiated and approved centrally for all of their individual
> locations. Further, such retailers often prefer to deal with and pay a
> single vender – generally the manufacturer – so as to reduce
> transaction costs and be able to hold a single party responsible for
> any marketing problems that might arise. Therefore, suppliers
> selling through independent distributors seeking to respond to the

1   realities of serving national accounts must cope with antitrust risks.[1]

2   6.   Gruma acknowledges exactly this: "large and multi-regional accounts," [2]

3   which "require central purchasing and billing," [3] may "choose to negotiate with

4   [Gruma] regarding suggested mark-ups and/or other terms and conditions of sale,

5   *pricing*, invoicing, allowances, promotions, and similar matters pertaining to the sale of

6   Products from Distributor." (SDDA, Spring 2018 Amendment, emphasis added.) In

7   fact, those Material Customers, the Chain Stores, only negotiate with Gruma.

8   7.   To meet the Material Customers' requirements of central purchasing and

9   billing, Gruma follows a scan-based trading ("SBT") model. Under SBT, for each

10  product a retail customer has *scanned* at the store checkout, the Chain Stores pay

11  Gruma the "resale price" they have agreed to (i.e., fixed) and have input into a database.

12  8.   For each item scanned, Gruma passes the "resale price" to its

13  Distributors, who have previously purchased Gruma's products from Gruma at a lower

14  "distributor price." The difference between the distributor price and the resale price is

15  the "mark-up" percentage set forth in the SDDA. (The mark-up varies from product to

16  product, and Gruma has the sole prerogative to change it. *See* SDDA, ¶ 4.b.)

17  9.   The Distributors cannot change the resale prices to Chain Stores, i.e., the

18  prices in the database, and the Chain Stores simply will not negotiate with Distributors.

19  10.   Plaintiff brings this action on behalf of itself and the members of a

20  putative class consisting of all persons or entities who, between four years before the

21  date of this complaint's filing through to the present and continuing to the time of trial

22  (the "Class Period"), are or were signatories to an agreement with Gruma for the

23  distribution of Products within California (the "Class").

24

25  _____

26  [1] Irving Scher, *Antitrust Advisor* (5th ed. 2017 update) § 3:27 (Scher).

27  [2] Gruma uses the term, "Material Customers (i.e. national or regional chains)."
    (SDDA Amendment Summary, California.)

28  [3] Id.

3

CLASS ACTION COMPLAINT

**THE PARTIES**

**A.   Plaintiff**

11.     At all relevant times, Plaintiff Citywide Consultants & Food Management, LLC, was and is a Nevada corporation, with offices in the County of San Bernardino, and a signatory to one or more agreements with Gruma for the distribution of goods within California during the Class Period.  Plaintiff was damaged and lost money or property as a result of Defendants' price-fixing scheme alleged herein.

**B.   Gruma**

12.     Defendant Gruma Corporation is, and at all times mentioned herein was, a Nevada corporation with its principal place of business in Irving, Texas.  Gruma Corporation does business as "Gruma" and "Mission Foods," within the State of California.

**C.   Chain Grocer Defendants**

13.     Defendant Smart & Final Stores, Inc., is, and at all times mentioned herein was, a Delaware corporation, with its principal place of business in Los Angeles County, California.  Smart & Final is warehouse-style food and supply chain operating 326 stores in California and the western United States.

14.     Defendant Stater Bros. Markets is, and at all times mentioned herein was, a California corporation with its principal place of business in San Bernardino County, California.  Stater Bros. is a privately held supermarket chain, consisting of 172 stores located throughout Southern California.

15.     Plaintiff does not know the true names or capacities of the persons or entities sued herein as DOES 1-100, inclusive, and therefore sues said Defendants by such fictitious names.  Each DOE Defendant resided in, did business in, availed itself of the jurisdiction of, and/or injured Plaintiff and a significant number of Class Members

4

1   in the State of California.  Plaintiff will amend this complaint to set forth the true names

2   and capacities of the DOE Defendants when they have been ascertained, together with

3   appropriate charging allegations, as may be necessary.

4         16.    At all times mentioned herein, each Defendant was the agent, servant,

5   and/or co-conspirator of the other Defendants and in acting and omitting to act as

6   alleged herein did so within the course and scope of that agency and/or conspiracy.

8                  **GENERAL ALLEGATIONS**

9   **A.**    **Gruma's Business**

10        17.    Gruma manufactures and distributes baked goods, such as tortillas, under

11   brand names including Mission, Guerrero, and Calidad.

12        18.    Gruma is among the world's largest producers of flatbread, tortilla and

13   corn flour products with factories in Los Angeles County, including the world's largest

14   tortilla plant in Los Angeles, California.

15        19.    At all relevant times, Gruma has also distributed goods that it does not

16   manufacture, such as Lender Bagels and Pace sauces.

17        20.    Throughout this Complaint, unless otherwise required by context, the

18   term "Products" shall include:  corn and flour tortillas, tortilla chips, and other food

19   products manufactured or sold by Gruma to Plaintiff and the Class.

20        21.    Gruma contracts with Class Members to distribute Products.  The written

21   agreement is entitled a Store Door Distribution Agreement and includes amendments

22   thereto (herein "SDDA").

23        22.    The SDDA provides that "Title and risk of loss to the Products shall pass

24   to Distributor upon delivery of the Products to Distributor."  (SDDA, ¶ 4.a.)

25        23.    Virtually all of the retail sales of Defendants' Products to consumers take

26   place through third-party chain stores, such as supermarkets, food stores, warehouse

27   stores, or convenience stores.  These entities are referred to herein as "Chain Stores"

28   and include Smart & Final and Stater Bros., and other similar stores.

CLASS ACTION COMPLAINT

24.     With so-called "direct store delivery" (also known as "DSD"), the Chain Stores allocate a certain space and location within their establishments for the display of Defendants' products.  Gruma's Products are distributed to the Chain Stores during the stores' receiving hours by Class Members, who may also arrange the product on the shelves and displays.

25.     The SDDA explicitly states that Gruma's distributors, including Plaintiff and other Class Members, are workers "engaged in … interstate commerce."  In accordance with the United States Supreme Court decision in *New Prime, Inc. v. Oliveira* (2019) 586 U.S.___, 139 S. Ct. 532, they are exempt from the Federal Arbitration Act.

**B.     Gruma's "Supplier Agreements" with Chain Stores**

26.     Gruma enters into agreements with Chain Stores, sometimes known as supplier agreements, slotting fee agreements, authorization agreements, and/or customer marketing agreements (herein generally "Supplier Agreements") whereby Gruma commits to sell, deliver, market, and merchandise Products and the Chain Stores agree to provide shelf space for Gruma's products.  (To "merchandise" means to arrange products on shelves in a way that is generally attractive to customers, e.g., with labels readable and products filling the shelves' visible areas.)

27.     Gruma negotiates the terms in the Supplier Agreements, including the price at which the Chain Stores purchase Products, without the involvement of the Plaintiff or the Class.

28.     The Supplier Agreements are generally confidential and not known or available to Class Members, who are effectively kept in the dark as to their existence and terms.

29.     Supplier Agreements are not always signed agreements.  In some circumstances, Gruma and the Chain Stores perform based on oral proposals as if a fully executed agreement were in place.

6

CLASS ACTION COMPLAINT

30.     Gruma introduces products, sets prices, obtains authorizations, arranges for displays, obtains more space, determines the type and frequency of promotions, deals and in-store demonstrations, and deals with grocer and retail customer complaints.

31.     The prices fixed by Gruma and the Chain Stores are maintained in computerized databases which form the basis for Chain Stores' payments to Gruma for Products.

32.     Class Members to cannot sell products to Chain Stores without using SBT.

33.     The SBT system does not allow Class Members to change the prices to Chain Stores.

34.     Based on the databases maintained by Defendants, including the computerized accounting system that the Class Members are required to use, Chain Stores pay Defendants directly for the Products sold and delivered to them by the Class Members, and then Gruma pays the Class Members the price fixed between Gruma and the Chain Stores.

**C.     Gruma's "Distribution Agreements" with Class Members**

35.     Gruma distributes Products through Distributors, including Plaintiff and the Class Members, who sign SDDAs whereby Class Members agree to buy Products from Gruma and resell them to retailers, including the Chain Stores.

36.     The SDDAs are standardized agreements drafted entirely by Gruma and, at least as to the terms described herein, Class Members are not able to negotiate their terms.

37.     Through the SDDAs, Class Members receive a specific geographic area, known as a "Sales Area" or "Route," in which they are to distribute Gruma's Products to retail stores.  Class Members are not permitted to distribute Gruma's Products outside their designated areas.

38.     Class Members generally obtain the contractual right to buy then sell

7

EXHIBIT A, PAGE 20

1  Gruma's Products by purchasing a Route from another distributor or, if the route has been
2  abandoned or otherwise forfeited or is new, from Gruma.  The purchase price for the right to
3  enter into a Distribution Agreement can range from approximately $20,000 to $120,000,
4  with the route purchase price generally based on a multiple of (often ten times) the Route's
5  average weekly gross sales.

6      39.  The SDDAs state that Class Members are independent contractors:
7  "Distributor agrees that he or she is not an employee of Company for any purpose, but is an
8  independent sales and distribution contractor. ....  Distributor shall in no event purport to be
9  an employee of Company, but shall under all appropriate circumstances make it clear to
10  interested parties that Distributor is an independent contractor."  (SDDA ¶ 11 ["Relationship
11  Created."])  Gruma consistently insists on the independent contractor classification in
12  litigation, arbitration and before governmental authorities.

13

14  **D.**  **Class Members Are Required to Sell Products to Chain Stores at Prices Set**
15      **by Defendants and the Chain Stores**

16      40.  Class Members sell Products to Chain Stores and other retail stores.  They
17  are required to sell Gruma's Products to the Chain Stores at prices that are set between
18  the Gruma and the Chain Stores.

19      41.  Despite the fact that Class Members purchase the Products from the
20  Defendants and take title to the products, Class Members have no ability to negotiate
21  the price at which they sell Products to the Chain Stores.

22      42.  Chain Stores would refuse to do business with an independent distributor
23  if the distributor somehow offered a different price than that set with Gruma.

24      43.  Defendants require Class Members to comply with the fixed prices in at
25  least the following ways:  (1) through express provisions in the SDDA requiring the
26  Class to sell Products on the terms fixed by Defendants and the Chain Stores; (2) by
27  requiring Class Members to use computer systems that are pre-programmed with the
28  prices fixed by Defendants and the Chain Stores and which prices cannot be altered by

8

CLASS ACTION COMPLAINT

1    Class Members; and (3) through other coercive conduct such as Defendants' ability to

2    terminate Class Members' distribution rights or selling Products directly in Class

3    Members' routes.

4         44.    Defendants are the only source for Products in the Distribution

5    Agreements, so Plaintiff and the Class cannot (or are not permitted to) obtain Products

6    for sale at the same or any lower price from any other source.

7         45.    The SDDA expressly authorizes Gruma to negotiate prices with Chain

8    Stores: "Pricing. The Company and Distributor recognize that certain of Distributor's

9    *Material Customers* may, for their own convenience and efficiency, *choose to*

10    *negotiate with the Company regarding* suggested mark-ups and/or other terms and

11    conditions of sale, *pricing*, invoicing, allowances, promotions, and similar matters

12    pertaining to the sale of Products from Distributor. ...." (SDDA, Spring 2018

13    Amendment, emphasis added.)

14         46.    Although the SDDA nominally authorizes Distributors "to negotiate

15    pricing terms with any customer who consents to negotiate such pricing with the

16    Distributor," (SDDA Amendment Summary, California), this provision is meaningless

17    because the Distributors do not have the power to negotiate with Chain Stores.

18         47.    Defendants have eliminated any ability or right by which Class Members

19    can sell Product to Chain Stores at a price other than that set by Defendants.

20

21    **E.**    **Injury to Class Members**

22         48.    Class Members cannot set prices in accordance with their own judgment,

23    e.g., raise prices when demand is high or lower them when demand is low.

24         49.    By not being able to raise prices to Chain Stores (in Class Members'

25    exclusive territories) when demand will be high, Class Members' potential profits are

26    reduced.

27         50.    By not being able to lower prices to move inventory, Class Members are

28    unfairly saddled with the costs of unsold Products along with their time in delivering,

9

CLASS ACTION COMPLAINT

1    then removing and disposing of Products.  (Most of the Products are perishable, so,

2    unlike other goods, they cannot be saved and resold over an extended time.)

3

4    **ANTITRUST ALLEGATIONS**

5    **A.**    **Cartwright Act Is Broader than Federal Law in Prohibiting Price Fixing.**

6        51.    It has been said that "The crux of any price-fixing agreement is the

7    relinquishment by a trader ... of the freedom to set prices in accordance with his own

8    judgment." (*Chisholm Bros. Farm Equipment Co. v. International Harvester Co.* (9th

9    Cir. 1974) 498 F.2d 1137, 1142.) "All price fixing is illegal." (*Balian Ice Cream Co. v.*

10    *Arden Farms Co.* (S.D.Cal. 1952) 104 F.Supp. 796, 800, fn. 11.) "A vertical price-

11    fixing agreement, commonly known as resale price maintenance, involves the efforts of

12    a supplier to control the distribution of its product or service by retailers or distributors.

13    [Citation.]  Such an agreement limits the distributor's freedom to sell the supplier's

14    product at a price independently selected by the distributor [citation]; instead, the

15    supplier establishes the price at which its distributors may sell the supplier's products,

16    resulting in maintenance of the resale price at a single level.  .... A vertical price-fixing

17    or resale price maintenance agreement between supplier and distributor 'destroys

18    horizontal competition as effectively as would a horizontal agreement among

19    distributors or retailers' [citation] and is per se unlawful under the Cartwright Act.

20    [Citation.]" (*Kunert v. Mission Financial Services Corp.* (2003) 110 Cal.App.4th 242,

21    263.)

22        52.    California's antitrust law, the Cartwright Act, was enacted in 1907 "in

23    reaction to the perceived ineffectiveness" of the Sherman Act.  (ABA Section of

24    Antitrust Law, State Antitrust Practice and Statutes (3d ed. 2004), at p. 6-1.)  It is

25    "broader in range and deeper in reach than the Sherman Act ...." (*Cianci v. Superior*

26    *Court* (1985) 40 Cal.3d 903, 920.)  It "reaches beyond the Sherman Act to threats to

27    competition in their incipiency ... and thereby goes beyond 'clear-cut menaces to

28    competition' in order to deal with merely 'ephemeral possibilities' [citation]." (*Id.* at p.

10

CLASS ACTION COMPLAINT

918.)

53.    "[H]istorical and textual analysis reveals that the [Cartwright] Act was patterned after the 1889 Texas [antitrust] act and the 1899 Michigan [antitrust] act, and not the Sherman Act. [Citation.]  Hence judicial interpretation of the Sherman Act, while often helpful, is not directly probative of the Cartwright drafters' intent, given the different genesis of the provision under review." (*State of California ex rel. Van de Kamp v. Texaco, Inc.* (1988) 46 Cal.3d 1147, 1164 [superseded by statute on other grounds by *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 570].)

54.    From 1931 until 1976, California expressly allowed vertical price fixing under the so-called "Fair Trade Act." (*See ABC Internat. Traders, Inc. v. Matsushita Electric Corp.* (1997) 14 Cal.4th 1247, 1260-1261 ["In California, a fair trade law, authorizing retail price maintenance agreements with respect to trademarked products, had been passed in 1931 and strengthened in 1933. (Stats. 1931, ch. 278, p. 583; Stats. 1933, ch. 260, § 1, p. 793, repealed Stats. 1975, ch. 402, § 1, p. 878.)"].)

55.    In 1975, California repealed the Fair Trade Act, "reflect[ing] a growing apprehension that fair trade laws [were] not in the public interest." (*Rice v. Alcoholic Beverage Control Appeals Bd.* (1978) 21 Cal.3d 431, 438.)

56.    Regardless of their views on the economic benefits or detriments of vertical price fixing, courts have "neither the power nor the duty to determine the wisdom of any economic policy; that function rests solely with the legislature." (*Max Factor & Co. v. Kunsman* (1936) 5 Cal.2d 446, 454.)  "It is primarily a legislative and not a judicial function to determine economic policy." (*Id.* at p. 155.)

57.    The Cartwright Act, Business and Professions Code section 16720, et seq., prohibits unlawful "trusts," defined in relevant part as follows:

[A] combination of capital, skill or acts by two or more persons for any of the following purposes:

...

11

EXHIBIT A, PAGE 24

1       (e) To make or enter into or execute or carry out any contracts,

2  obligations or agreements of any kind or description, by which they do all or

3  any or any combination of any of the following:

4       ...

5       (2) Agree in any manner to keep the price of such article, commodity

6  or transportation at a fixed or graduated figure.

7      58.   California's position is simple: "vertical price-fixing" is a "per se

8  violation of the Cartwright Act (Bus. & Prof. Code § 16720 et seq.), as well as the

9  Unfair Competition Law (the 'UCL,' Bus. & Prof. Code § 17200 et seq.)." (*State of*

10  *California v. Bioelements, Inc.* (Super. Ct.  Riverside County, 2010, No. 10011659,

11  Complaint, ¶ 1 [http://oag.ca.gov/system/files/attachments/press_releases/

12  n2028_bioelements_complaint.pdf]). "Under current California Supreme Court

13  precedent, vertical price restraints are per se unlawful under the Cartwright Act.

14  [Citation.] There is no indication that precedent is changing." (*Darush v. Revision LP*

15  (C.D.Cal. Apr. 10, 2013), No. CV 12-10296 GAF (AGRx), 2013 WL 1749539, at *6;

16  *see* Richard M. Steuer, The Simplicity of Antitrust Law, 14 U. Pa. J. Bus. L. 543, 547

17  (2012) ["[T]he rule of per se illegality against minimum resale price maintenance

18  remains under the laws of certain states. See, e.g., *California v. DermaQuest, Inc.*,

19  2010-1 Trade Cas. (CCH) P 76,922 (Cal. Super. Ct. Feb. 23, 2010)"].)

21               **CLASS ALLEGATIONS**

22  **A.**   **Definition of Plaintiff Class and Subclasses.**

23      59.   The Class consists of all persons or entities that, during the Class Period,

24  are or were signatories to one or more SDDAs with Gruma for the distribution of

25  Products within California, and were damaged thereby.

26      60.   Plaintiff signed an SDDA in or about April 2008 and an amendment

27  thereto in or about March 2018.

28      61.   The Class defined herein may be divided, in this Court's discretion, into

CLASS ACTION COMPLAINT

subclasses.  The aforementioned Class and any other sub-classes to be later defined are collectively referred to herein as the Class.

**B.**   **Maintenance of the Action.**

62.    Plaintiff brings this action individually, on behalf of the Class, and as representative of all similarly situated persons pursuant to Business & Professions Code sections 17203 and 17204 and Code of Civil Procedure section 382.

**C.**   **Class Action Requisites.**

63.    At all material times, Plaintiff was and is a member of the Class.

64.    This Class Action meets the statutory prerequisites for the maintenance of a Class Action as set forth in Code of Civil Procedure section 382, in that:

(a)    The persons who comprise the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims as a class will benefit the parties and the Court.  More than 100 individuals have signed the SDDA;

(b)    Nearly all factual, legal, statutory, declaratory and injunctive relief issues that are raised in this Complaint are common to the Class and will apply uniformly to every member of the Class;

(c)    Plaintiff's claims are typical of the claims of each member of the Class.  Plaintiff, like all other members of the Class, has sustained injury in fact and lost money or property as a result of Defendants' violations of the laws of the State of California.  Plaintiff and the members of the Class were and are similarly or identically harmed by the same unlawful, deceptive, unfair, systematic and pervasive pattern of misconduct engaged in by the Defendants; and

(d)    Plaintiff will fairly and adequately represent and protect the interests of the Class, and has retained counsel who are competent and experienced in class action litigation.  There are no material conflicts between

13

CLASS ACTION COMPLAINT

1    Plaintiff's claims and the Class Members' claims that would make class

2    certification inappropriate.  Counsel for the Class will vigorously assert the

3    claims of all Class Members.

4    65.    In addition to meeting the statutory prerequisites to a class action, this

5    action is properly maintained as a class action pursuant to Code of Civil Procedure

6    section 382, in that:

7    (a)    Without class certification and determination of declaratory,

8    injunctive, statutory and other legal questions within the class format,

9    prosecution of separate actions by individual members of the Class will create

10   the risk of:

11   1)    Inconsistent or varying adjudications with respect to

12   individual members of the Class which would establish incompatible

13   standards of conduct for the parties opposing the Class; or

14   2)    Adjudication with respect to individual members of the Class

15   which would as a practical matter be dispositive of the interests of the

16   other members not parties to the adjudication or substantially impair or

17   impede their ability to protect their interests.

18   (b)    The parties opposing the Class have acted or refused to act on

19   grounds generally applicable to the Class, thereby making appropriate final

20   injunctive relief or corresponding declaratory relief with respect to the Class as a

21   whole.

22   (c)    Common questions of law and fact exist as to the members of the

23   Class and predominate over any questions affecting only individual members,

24   and a class action is superior to other available methods for the fair and efficient

25   adjudication of the controversy, including consideration of:

26   1)    The interests of the members of the Class in individually

27   controlling the prosecution or defense of separate actions;

28   2)    The extent and nature of any litigation concerning the

14

CLASS ACTION COMPLAINT

1    controversy already commenced by or against members of

2    the Class;

3    3)    The desirability or undesirability of concentrating the

4          litigation of the claims in the particular forum; and

5    4)    The difficulties likely to be encountered in the management

6          of a class action.

7    66.    This Court should permit this action to be maintained as a class action

8    pursuant to Code of Civil Procedure section 382 because:

9    (a)    The questions of law and fact common to the Class predominate

10         over any question affecting only individual members;

11   (b)    A class action is superior to any other available method for the fair

12         and efficient adjudication of the claims of the members of the Class;

13   (c)    Plaintiff and the other members of the Class will not be able to

14         obtain effective and economic legal redress unless the action is

15         maintained as a class action;

16   (d)    There is a community of interest in obtaining appropriate legal and

17         equitable relief for the common law and statutory violations and

18         other improprieties, and in obtaining adequate compensation for the

19         damages and injuries which Defendants' actions have inflicted on

20         the Class; and,

21   (e)    There is a community of interest in ensuring that the combined

22         assets and available insurance of Defendants are sufficient to

23         adequately compensate the members of the Class for the injuries

24         sustained.

25   67.    Gruma's SDDA contains a class action waiver; however, that waiver is

26   not enforceable under *Gentry v. Superior Court* (2007) 42 Cal.4th 443. (*Muro v.*

27   *Cornerstone Staffing Solutions, Inc.* (2018) 20 Cal.App.5th 784, 792-793 ["Because we

28   have concluded the FAA is not applicable, the appropriate test under California law to

15

CLASS ACTION COMPLAINT

1   determine whether to enforce the 'class waiver' provisions of an arbitration agreement

2   remains the four-part analysis under *Gentry*."].)

3       68.    A class action is likely to be a significantly more effective practical

4   means of vindicating the rights of the Class Members than individual litigation or

5   arbitration, and there would be less comprehensive enforcement of the applicable laws

6   if the class action device is disallowed.  Specifically, the following factors favor a class

7   action over individual actions:

8       (a)    The size of the recovery for Class Members would be too modest to

9       pursue individually in individual actions for antitrust violations and

10       unfair business practices.

11       (b)    There is a strong potential for retaliation against Class Members

12       who pursue these claims.  For example, in 2017-2018, Gruma

13       terminated at least four distributors in retaliation for their

14       participation in a group, Association of Mission Food Distributors

15       (Southern California), which was organized to represent the

16       Distributors' interests.

17       (c)    Absent Class Members, many of who are individual drivers

18       operating small businesses and whose primary language is Spanish,

19       may not be well-informed of their rights including their claims for

20       antitrust violations and unfair business practices.

21       (d)    Other real world obstacles inhibit vindication of Class Members'

22       rights through individual actions.  Among other things, Class

23       Members' claims against the Chain Stores are not subject to

24       arbitration, because there is no arbitration agreement between these

25       parties.  Therefore, individual arbitrations will not provide complete

26       relief.

27       69.    Plaintiff contemplates the eventual issuance of notice to the proposed

28   Class that would set forth the subject and nature of the instant action.  Defendants'

CLASS ACTION COMPLAINT

1   business records may be used for assistance in the preparation and issuance of the

2   contemplated notices.  To the extent that any further notices may be required, Plaintiff

3   would contemplate the use of additional media and/or mailings.

4

5   **D.    Common Questions.**

6        70.    Among the many *questions of law and fact* common to the class are

7   whether:

8        (a)    Chain Stores require central purchasing and billing;

9        (b)    Chain Stores and Gruma use databases for purchasing and billing;

10       (c)    Chain Stores and Gruma negotiate the prices the Chain Stores will

11  pay for products sold by Distributors;

12       (d)    Chain Stores are not willing to negotiate with Distributors the prices

13  Chain Stores pay to Gruma for the products sold by Distributors;

14       (e)    Gruma bills and collects from Chain Stores;

15       (f)    Plaintiff and the Class are entitled to the class-wide relief sought in

16       this Complaint;

17       (g)    Defendants' price fixing arrangement constitutes an unreasonable

18       restraint of trade in violation of the Cartwright Act (Bus. & Prof.

19       Code, § 16720 et seq.);

20       (h)    Defendants' price fixing arrangement violates the UCL (Bus. &

21       Prof. Code, § 17200 et seq.);

22       (i)    The amount of damages to which the Class is entitled; and

23       (j)    The nature and amount of restitution and equitable relief to which

24       the Class is entitled.

25       71.    A class action is superior to all other methods for the fair and efficient

26  adjudication of this controversy, since joinder of all Class Members is impracticable

27  and since many legal and factual questions to be adjudicated apply uniformly to all

28  Class Members.  Further, as the economic or other loss suffered by vast numbers of

17

CLASS ACTION COMPLAINT

1   Class Members may be relatively small, the expense and burden of individual actions
2   makes it difficult for the Class Members to individually redress the wrongs they have
3   suffered.  Moreover, in the event disgorgement is ordered, a class action is the only
4   mechanism that will permit the employment of a fluid fund recovery to ensure that
5   equity is achieved.  There will be relatively little difficulty in managing this case as a
6   class action.
7       72.     The class action is superior to other available methods for a fair and
8   efficient adjudication of the claims and would reduce the financial, administrative and
9   procedural burdens on the parties and on the Court which individual litigation would
10  otherwise impose.
11
12                                    **VENUE**
13      73.     Plaintiff brings this action in Los Angeles County – the location of
14  Gruma's world's largest tortilla plant.  (SDDA, Spring 2018 Amendment, § 15
15  ["Arbitration"], subsection c ["Claims not Covered by this Arbitration Clause"],
16  subsection iii ["In the event that the parties' waiver of the right to assert class and
17  collective action Claims is not legally enforceable, any and all Claims and causes of
18  action arising out of or relating to this Agreement asserted as a class action under
19  Federal Rule of Civil Procedure 23, any similar state statute or rule of judicial
20  procedure, or any equivalent arbitration procedure, shall be filed first in a court of law
21  of competent jurisdiction located within the State and County where the affected
22  Company's Facility is located."].)
23
24                          **FIRST CAUSE OF ACTION**
25                  (Cartwright Act, Bus. & Prof. Code, § 16720 et seq.)
26                   (By Plaintiff and the Class against all Defendants)
27      74.     Plaintiff re-alleges and incorporates by reference each allegation
28  contained in the foregoing paragraphs.

                                        18

                            CLASS ACTION COMPLAINT

75.     At all relevant times herein, Gruma has and continues to combine, conspire, and agree with Chain Stores to fix the price at which Plaintiff and the Class must sell Products to the Chain Stores.

76.     Defendants accomplish this price fixing by including provisions in the Distribution Agreements which require Class Members to comply with the terms of the agreements reached between Defendants and the Chain Stores and by doing all of the billing to and collecting from the Chain Stores at the fixed prices.

77.     Defendants' vertical price fixing practices constitute *per se* violations of the Cartwright Act.

78.     As a direct, foreseeable and proximate result of Defendants' violations of the Cartwright Act described above, Class Members are not permitted to either increase the resale price to the Chain Stores to generate more profit on each unit of product they sell, decrease the price charged to Chain Stores in the attempt to sell more units of product, or give direct discounts to consumers in the attempt to sell more units of product.  Accordingly, Class Members have suffered damages due to Defendants' conduct in an amount to be proven at trial.

79.     Plaintiff and the Class are entitled to injunctive relief to prevent and preclude Defendants' anticompetitive conduct.  Under the Cartwright Act, Plaintiff and the Class may "recover ... preliminary or permanent injunctive relief when and under the same conditions and principles as injunctive relief is granted by courts generally under the laws of this state and the rules governing these proceedings ... ." (Bus. & Prof. Code, § 16750.)  In the absence of appropriate injunctive relief, Defendants' violations of the antitrust laws will continue unabated in the State of California and Plaintiff and/or the Class will continue to suffer the harm complained of in this action.

80.     Defendants acted intentionally, oppressively and maliciously toward Plaintiff and the Class with a conscious disregard of their rights, or the consequences to Plaintiff and the Class, with the intent of depriving Plaintiff and the Class of property and legal rights and otherwise causing the Plaintiff and the Class injury.

19

CLASS ACTION COMPLAINT

## SECOND CAUSE OF ACTION

(Unfair Business Practices, Bus. & Prof. Code, § 17200 et seq.)

(By Plaintiff and the Class against all Defendants)

81.     Plaintiff re-alleges and incorporates by reference each allegation contained in the foregoing paragraphs.

82.     Defendants are "persons" as defined under Business and Professions Code section 17201.

83.     Plaintiff and the Class have suffered injury in fact and have lost money or property as a result of Defendants' price fixing.  For instance, by not being able to raise prices to Chain Stores (in their exclusive territories) when demand will be high, Class Members' potential profits are reduced.

84.     Defendants' price fixing is unfair, unlawful, and/or fraudulent as follows:

   (a)   *Unlawful.*  The price fixing practice, as alleged herein, is unlawful under the Cartwright Act.

   (b)   *Unfair.*  The utility of Defendants' price fixing practice scheme – wherein Gruma sells Products to distributors and (along with the Chain Grocers) fixes resale prices on those Products – is outweighed by the injury to Class Members and to the general public.  (*See Motors, Inc. v. Times Mirror Co.* (1980) 102 Cal.App.3d 735, 740 [balancing test].)

   (c)   *Unfair.*  Defendants' price fixing "offends an established public policy" and is "immoral, unethical, oppressive, and unscrupulous..." (*Smith v. State Farm Mutual Automobile Ins. Co.* (2001) 93 Cal.App.4th 700, 719.)

   (d)   *Unfair.*  Defendants' violation of public policy is "'tethered" to specific constitutional, statutory or regulatory provisions.'" (*Scripps Clinic v. Superior Court* (2003) 108 Cal.App.4th 917, 940.)

20

CLASS ACTION COMPLAINT

85.     As a result of their unlawful and/or unfair acts, Defendants have reaped and continue to reap unfair benefits and illegal profits at the expense of Class Members, law-abiding competitors, and the general public.  Defendants should be enjoined from these activities and made to disgorge their ill-gotten gains.

86.     Because injunctive relief is an appropriate remedy for Defendants' unfair and/or unlawful business practices, arbitration of this claim cannot be compelled notwithstanding the SDDA's arbitration provision.  (SDDA, Spring 2018 Amendment, § 15.)  Holding otherwise would allow Gruma to avoid the public policy underlying the Unfair Practices Act and particularly section 17203, i.e., "Any person who engages, has engaged, or proposes to engage in unfair competition *may be enjoined* in any court of competent jurisdiction. ...."  (Emphasis added; *see* Civ. Code, § 1668 ["All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."]; and *see Gentry, supra,* 42 Cal.4th at p. 456 ["[A]rbitration agreement may not limit the damages normally available under the statute (*Armendariz, supra,* 24 Cal.4th at p. 103)"].)

**PRAYER**

WHEREFORE, Plaintiffs pray for judgment as follows:

**FIRST CAUSE OF ACTION (CARTWRIGHT ACT)**

a.  For damages in an amount yet to be ascertained;

b.  For treble damages;

c.  For punitive damages;

d.  For injunctive relief; and

e.  For prejudgment interest according to law in an amount yet to be ascertained.

**SECOND CAUSE OF ACTION (UNFAIR COMPETITION LAW)**

21

CLASS ACTION COMPLAINT

a. For the equitable, injunctive, restitutionary, disgorgement, and declaratory relief; and

b. For prejudgment interest according to law in an amount yet to be ascertained.

### ALL CAUSES OF ACTION

a. For Certification of the Classes defined herein, or such other Classes and/or subclasses as the Court will certify;

b. For reasonable attorney' fees;

c. For costs of suit; and

d. For such other and further relief as this Court may deem just and proper.

Dated:  March 26, 2019

MARKUN ZUSMAN FRENIERE & COMPTON LLP

Jeffrey K. Compton

Attorneys for Plaintiff and the Class

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable.

Dated:  March 26, 2019

MARKUN ZUSMAN FRENIERE & COMPTON LLP

Jeffrey K. Compton

22

CLASS ACTION COMPLAINT