PAUL GROSSMAN (SB# 035959)
paulgrossman@paulhastings.com
DONNA M. MELBY (SB# 86417)
donnamelby@paulhastings.com
CHRIS A. JALIAN (SB# 295564)
chrisjalian@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, California  90071-2228
Telephone:  (213) 683-6000

DUANE H. ZOBRIST (SB# 43813)
dzobrist@zoblaw.com
ZOBLAW
1900 Arlington Boulevard, Suite B
Charlottesville, Virginia  22903
Telephone:  (434) 977-9666

Attorneys for Defendants
GRUMA CORPORATION;
SMART & FINAL STORES, INC.; and
STATER BROS. MARKETS

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITYWIDE CONSULTANTS & FOOD MANAGEMENT, LLC, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>GRUMA CORPORATION, a Nevada corporation, dba MISSION FOODS CORPORATION; SMART & FINAL STORES, INC.; STATER BROS. MARKETS; and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No. 2:19-cv-04724<br><br>**DECLARATION OF RON ANDERSON IN SUPPORT OF MOTION TO COMPEL ARBITRATION OF DEFENDANTS GRUMA CORPORATION, SMART & FINAL STORES, INC. AND STATER BROS. MARKETS MOTION TO COMPEL ARBITRATION**<br><br>Date:        July 29, 2019<br>Time:        1:30 p.m.<br>Courtroom:  7D<br>Judge:       Hon. Dale S. Fischer<br><br>Complaint Filed:  March 26, 2019<br>Trial Date:        Not yet set |

# DECLARATION OF RON ANDERSON

I, Ron Anderson, declare as follows:

1.      I am employed by Gruma Corporation as the Vice President of Sales.

2.      I make this Declaration based on my own personal knowledge.  If called upon as a witness in this action, I could and would competently testify as to the matters set forth herein.

3.      Based on my position with Gruma, I am knowledgeable about Gruma's distribution agreements with its independent contractors, and the manufacture, sale and distribution of Gruma's product in the United States.

4.      Beginning in 2018, Gruma presented to all persons and entities with Store Door Distribution Agreements, including Citywide Consultants & Food Management, LLC, a proposed amendment (the "2018 Amendment") to the Store Door Distributor Agreement previously applicable to those persons and entities.

5.      Gruma and Citywide executed the 2018 Amendment on May 9, 2018. A true and correct copy of Citywide's fully-executed 2018 Amendment is attached hereto as **Exhibit A**.

6.      About 10 years previously, on April 17, 2008, Gruma and Citywide had entered into the Store Door Distributor Agreement.  A true and correct copy of Citywide's April 17, 2008 Store Door Distributor Agreement is attached hereto as **Exhibit B**.

1    7.    The 2018 Amendment contained an arbitration agreement.

2

3    8.    Gruma did not mandate or require that its independent contractors,

4    including Citywide, enter into the 2018 Amendment. Gruma certainly hoped that

5    its distributors would see the proposed 2018 Amendment as mutually beneficial,

6    and toward that end Gruma included in it numerous substantive changes to the

7    parties' relationship that Gruma thought would be attractive to distributors. For

8    example, Gruma in the 2018 Amendment offered (in addition to the arbitration

9    agreement) express terms advantageous to distributors, including the right to

10    "promote, distribute, and sell goods or products for other third-party

11    manufacturers" in addition to Gruma; the right to "communicate and negotiate with

12    any of its Eligible Customers the price, terms of sale, billing, and all other [issues],"

13    regardless of any agreement that Gruma itself had made with the customer; the right

14    not to "perform any . . . services . . . personally," but instead do it through others

15    that the distributor would hire or otherwise retain; and the right to "sell or assign . .

16    . its distribution rights . . . to an assignee." Distributors overwhelmingly embraced

17    the package of changes the 2018 Amendment made. But Gruma was not prepared

18    to, and did not, insist that any distributor enter into the 2018 Amendment as a

19    condition of retaining his, her, or its status as a Gruma distributor. Each was

20    entitled to continue association with Gruma under the Store Door Distribution

21    Agreement previously in effect, without the proposed 2018 Amendment.

22

23    9.    Gruma is a bakery. It exclusively manufactures the Gruma products

24    sold and delivered by Citywide in Gruma's California bakeries. Citywide does not

25    distribute any Gruma products manufactured in any other state or country.

26

27    10.    Citywide is run by Randy Evans, a business professional, who makes

28    the business decisions for Citywide.

11.    Pursuant to the Store Door Distribution Agreement and 2018 Amendment, Citywide had the exclusive right to sell to any stores within its geographic territory.  Citywide's geographic territory covered only a small portion of Riverside County, and did not cross even county lines let alone California's borders.  Rather, Citywide's geographic territory was entirely within a portion of the borders of the City of Moreno Valley.  Specifically, pursuant to Exhibit A-1 of Citywide's Store Door Distribution Agreement, Citywide's geographic territory extended from Alessandro Boulevard to Iris Avenue, approximately two miles from north to south, and from the 215 Freeway to Lasselle Street, approximately five miles from east to west.

12.    Citywide was responsible for soliciting and contracting direct sales to new stores within its territory and could work to increase sales to existing stores.

13.    Citywide determined the quantity of products it believed it would be able to sell, and then ordered and purchased those products from Gruma.

14.    Citywide took title to the products when Gruma made its product available at Citywide's warehouse in Perris, California, a few miles from Citywide's geographic territory in Moreno Valley, and then Citywide sold the products to nearby retail stores.

15.    At those stores, Citywide was solely responsible for stocking the display areas and rotating expired products, which requires determining the number of units to deliver.

16.    Citywide generated its own invoices for the retail stores to which it sold product.

17.    After Citywide took title to Gruma's products, Citywide assumed the risk of loss for any product that was damaged or went unsold.

18.    Citywide was responsible 24/7 for responding to all customer-service requests from the retail stores in its geographic area.

19.    Citywide was not obligated to perform these duties itself; it was free to, and did, engage employees to perform these duties on its behalf.

20.    Gruma has formally agreed to indemnify and defend Smart & Final Stores, Inc. and Stater Bros. Markets with respect to the Citywide's claims in *Citywide Consultants & Food Management LLC v. Gruma Corporation, et al.*, United States District Court, Central District of California, Case No. 2:19-cv-04724.

I declare under penalty of perjury under the laws of the State of California, the State of Nevada, the State of Texas, and the United States of America that the foregoing is true and correct.

Executed this __/__ day of June, 2019 in Irving, Texas

RON ANDERSON

# EXHIBIT A

**AMENDMENT TO**
**STORE DOOR DISTRIBUTOR AGREEMENT**
**(CALIFORNIA)**

THIS AMENDMENT (the "Amendment") is made and entered into as of the date indicated below, by and between Gruma Corporation, a Nevada corporation ("Company"), and the undersigned distributor ("Distributor"), and amends any and all Store Door Distributor Agreement(s) previously signed between the parties (collectively referred to as the "SDDA").

**RECITALS**

WHEREAS, Company and Distributor entered into one or more SDDA, and they want to amend any and all SDDA previously signed between the parties pursuant to the terms hereunder.

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants and obligations of the parties contained in the SDDA and this Amendment, it is mutually agreed as follows:

1.  If Section 1 (i) of the SDDA provides for a Formula Value of "two times the average weekly net sales of Products", Section 1 (i) of the SDDA is hereby amended to increase the Formula Value to "three times the average weekly net sales of Products". Other than the increase in the multiplying factor, the rest of Section 1 (i) remains unchanged and in full force and effect.

2.  Section 2 of the SDDA is hereby amended to add subsection (d) as set forth in item **1** of the Appendix.

3.  Section 2 of the SDDA is hereby amended to add subsection (e) as set forth in item **2** of the Appendix.

4.  Section 6 of the SDDA is hereby amended to add an additional sentence at the end of the Section with the language set forth in item **3** of the Appendix.

5.  Section 7 (b) of the SDDA is hereby amended as set forth in item **4** of the Appendix.

6.  Section 7 (g) of the SDDA is hereby amended to add an additional sentence at the end of the Section with the language set forth in item **5** of the Appendix.

7.  Section 10 (a) (iv) of the SDDA is hereby amended and replaced with the language set forth in item **6** of the Appendix.

8.  Section 10 (a) (v) of the SDDA is hereby amended and replaced with the language set forth in item **7** of the Appendix.

9.  Section 13 of the SDDA is hereby amended to add an additional sentence at the end of the Section with the language set forth in item **8** of the Appendix.

10. Section 15 of the SDDA is hereby amended and replaced with the language set forth in item **9** of the Appendix.

11. The SDDA is hereby amended to add a new Section 16 with the language set forth in item **10** of the Appendix.

12. This Amendment may be executed in multiple original copies, identically worded, and each executed copy constitutes an original. Facsimile signatures, electronic signatures in connection with the electronic signature delivery system utilized by the parties, and signatures transferred in PDF or a similar format for scanned copies of documents are original signatures for all purposes of this Amendment and the SDDA.

13. All other terms and conditions of the SDDA remain in full force and effect. In the event of any conflict between the terms and conditions of this Amendment and the terms and conditions of the SDDA, this Amendment shall prevail. The terms defined in the SDDA and used in this Amendment have the same meanings as set forth in the SDDA, unless clearly otherwise defined in this Amendment.

14. This Amendment together with any SDDA signed by the parties, as amended, constitutes the entire agreement between the parties concerning the Store Door distribution of the Products to the Eligible Customers and supersedes all prior and contemporaneous agreements between the parties relating to such subject matter.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment effective as of the date indicated below.

Distributor Initials Re

**EXHIBIT A, PAGE 6**

**DISTRIBUTOR**

Signature: R H Evans (May 9, 2018)

Name: Randy HAROLD Evans

SSN: ### - ## - 8301

Address: 14895 White Box Lane

Email: cmrhevans@aol.com

Date: May 9, 2018

```
┌─────────────────────────────────────────────────┐
│ ADDITIONAL INFORMATION (Check Applicable)        │
│                                                   │
│ ☐   Distributor is a Sole Proprietor (Individual)*│
│                                                   │
│     If a Sole Proprietor, please provide Driver   │
│     License #:                                     │
│     _____                 │
│                                                   │
│ ☑   Distributor is an Entity (i.e. LLC, Inc.,     │
│     Corp., etc.)                                   │
│                                                   │
│     If an Entity, please provide name of Entity:  │
│     Citywide Consultants & Food Mngmt LLC         │
│                                                   │
│ *IMPORTANT: If Distributor has commenced the      │
│ process to transfer a route to a newly created    │
│ entity, but has not yet finalized this process    │
│ and signed all necessary paperwork, Sole          │
│ Proprietor should be checked. If in doubt,        │
│ please contact your District Sales Manager.       │
└─────────────────────────────────────────────────┘
```

**COMPANY**

Signature: Stephanie Johnson (May 9, 2018)

Name: Stephanie Johnson

Title: Corporate Counsel

2

| | **APPENDIX** |
|---|---|
| Item 1 | d. <u>Pricing</u>. The Company and Distributor recognize that certain of Distributor's Material Customers may, for their own convenience and efficiency, choose to negotiate with the Company regarding suggested mark-ups and/or other terms and conditions of sale, pricing, invoicing, allowances, promotions, and similar matters pertaining to the sale of Products from Distributor.  In order to accommodate the interests of any such Material Customer, and thereby maximize opportunity for the Distributor to sell Products to that Material Customer, Distributor acknowledges and agrees that Company may engage in such negotiations and communications with the Material Customer, including topics such as suggested mark-ups, terms and conditions of sale, pricing, promotions, allowances, and delivery of Products to the Material Customer, and will transmit such information to Distributor.  Distributor acknowledges and agrees that, as a Material Customer may request, the Company may perform centralized billing for a Material Customer.  Regardless of whether the Company may negotiate with any Material Customer regarding suggested mark-ups or any other terms and conditions of sale or billing, Distributor always remains able to communicate and negotiate with any of its Eligible Customers the price, terms of sale, billing, and all other aspects of the Distributor's relationship with that Eligible Customer. |
| Item 2 | e. Except as limited by Section 7 (c) of this Agreement, Distributor hereby acknowledges that Distributor has the ability, resources, equipment, and the consent under this Agreement to promote, distribute, and sell goods or products for other third-party manufacturers ("Distribution Services").  Distributor acknowledges and agrees that Distributor's decision whether or not to perform Distribution Services for any third-party manufacturer is at Distributor's sole discretion.  In the event that Distributor does not perform Distribution Services for other third-party manufacturers, it is solely because Distributor has made the strategic decision not to do so, and that Company has not in any way restricted Distributor.  Distributor further acknowledges that by choosing to not perform Distribution Services for other third-party manufacturers, Distributor is accepting the increased business risk inherent in running a business with only one customer, in this case, Company. |
| Item 3 | Nothing herein will be deemed to require that Distributor perform any of the services set forth in this Agreement personally.  Distributor is free to engage the Distributor's Representatives that Distributor deems appropriate to assist in performing Distributor's obligations hereunder. |
| Item 4 | b. *Intentionally omitted.* |
| Item 5 | If the Distributor elects to use a hand-held computerized accounting system, it may be pre-programmed and/or contain suggested mark-ups and other pricing information for Products sold by Distributor to certain Eligible Customers.  If, at any time, Distributor negotiates with any Eligible Customer a price for the sale of any Product different than the suggested mark-ups, including applicable promotions and allowances, and Distributor still wants to use the hand-held computerized accounting system with such Eligible Customer, Distributor shall notify the Company, and provide all required documentation requested in the sole discretion of the Company, at least thirty (30) days before the effective date for such price, so that the Company can determine the time frame in which the hand-held computerized accounting system can be modified to accommodate such price change.  Alternatively, Distributor is free to use paper based invoices with any of its Eligible Customers, as deemed appropriate or convenient. |
| Item 6 | iv. Distributor's failure to provide Adequate Service to any Material Customer which is serviced by Distributor hereunder (as, for example, Distributor's failure to service any such customer on any day on which such customer reasonably expects or requests to be serviced), which failure continues without cure for a period of 48 hours after Distributor's receipt of oral or written notice thereof from Company or is followed by any three (3) additional failures (whether or not similar, and whether or not involving the same Material Customer) within nine months after Distributor's receipt of any such oral or written notice. |
| Item 7 | v. Distributor's failure to comply fully with the provisions of Subsection 7(h) hereof, which failure continues without cure for a period of thirty (30) days after Distributor's receipt of oral or written notice thereof from Company or is followed by another failure (whether or not similar) within nine months after Distributor's receipt of any such oral or written notice. |
| Item 8 | Except as otherwise set forth herein, Distributor may sell or assign at market value, or for other good and valuable consideration, its distribution rights hereunder to an assignee acceptable to Company. |

Distributor Initials ___

**EXHIBIT A, PAGE 8**

| Item 9 | 15. **Arbitration.** Any disputes that may arise between the Company and Distributor shall be resolved as provided in this Section 15 ("Arbitration Clause"). |
|---|---|



a.  <u>Governing Law.</u>  The Federal Arbitration Act shall govern the interpretation, enforcement and all proceedings pursuant to this Arbitration Clause.  To the extent that the Federal Arbitration Act is inapplicable, the arbitration law of the state in which Distributor last rendered services to the Company shall apply.

b.  <u>Claims Covered by this Arbitration Clause.</u>

    i.  The Company and Distributor mutually consent to the resolution by arbitration of all claims or controversies ("Claims"), past, present or future, whether or not arising out of this Agreement (or its termination), that the Company may have against Distributor or that Distributor (and no other party) may have against any of the following:  (1) the Company, (2) its officers, directors, employees or agents in their capacity as such or otherwise, (3) the Company's parent, subsidiary and affiliated entities, and (4) all successors and assigns of any of them.

    ii.  The only Claims that are arbitrable are those that are justiciable under applicable federal, state or local law.  Arbitrable Claims include, but are not limited to:  Claims for compensation; Claims for breach of any contract or covenant (express or implied); tort Claims; Claims for retaliation or discrimination; and Claims for violation of any federal, state, or other governmental law, statute, regulation, or ordinance.

c.  <u>Claims not Covered by this Arbitration Clause.</u>

    i.  The Company and Distributor agree that neither shall initiate or prosecute any lawsuit or administrative action in any way related to any Claim covered by this Arbitration Clause, except that this Arbitration Clause does not prohibit the filing of or pursuit of relief through the following: (1) an administrative charge to any federal, state or local governmental board, office, or agency, or (2) any other communication to a federal, state or local governmental board, office, or agency (collectively, "Government Complaint").

    ii.  Claims that as a matter of law cannot be subject to arbitration are not covered by this Arbitration Clause.

    iii.  **To the maximum extent permitted by law, Distributor hereby waives any right to bring on behalf of persons or entities other than Distributor, or to otherwise participate with other persons or entities in, any class or collective action.**  In the event that the parties' waiver of the right to assert class and collective action Claims is not legally enforceable, any and all Claims and causes of action arising out of or relating to this Agreement asserted as a class action under Federal Rule of Civil Procedure 23, any similar state statute or rule of judicial procedure, or any equivalent arbitration procedure, shall be filed first in a court of law of competent jurisdiction located within the State and County where the affected Company's Facility is located.  All proceedings prior to and including a decision as to whether the alleged class will be certified (including without limitation any decisions on discovery motions or motions for dismissal or summary judgment prior to a class certification hearing) shall be judicially determined by the court, and where applicable reviewed by the appellate court(s).  Once a judicial decision has been made as to class certification, the Claims and causes of action shall be referred to and **resolved by arbitration** through JAMS consistent with the judicial ruling(s) and decision(s) theretofore made.

d.  <u>Time Limits for Commencing Arbitration and Required Notice of all Claims.</u>

    i.  The Company and Distributor agree that the aggrieved party must give written notice of any Claim to the other party no later than the expiration of the statute of limitations (deadline for filing) that the law prescribes for the Claim.  Otherwise, the Claim shall be deemed waived.  The filing of a Government Complaint shall not extend the statute of limitations for presenting any Claim to arbitration.  The aggrieved party is encouraged to give written notice of any Claim as soon as possible after the event or events in dispute so that arbitration of any differences may take place promptly.

Distributor Initials

**EXHIBIT A, PAGE 9**

    ii.   Written notice to the Company, or its officers, directors, employees or agents, shall be sent to the Legal Department at the Company's then-current United States headquarters address, which currently is 5601 Executive Drive, Suite 800, Irving, TX 75038. Distributor will be given written notice at the last address recorded in Distributor's official file.

    iii.   The written notice shall identify and describe the nature of all Claims asserted, the facts upon which such Claims are based, and the relief or remedy sought. The notice shall be sent to the other party by certified or registered mail, return receipt requested.

e.   <u>Representation</u>. Any party may be represented by an attorney or other representative selected by that party.

f.   <u>Discovery</u>. Each party shall have the right to take depositions of three fact witnesses and any expert witness designated by another party. Each party also shall have the right to make requests for production of documents to any party and to subpoena documents from third parties to the extent allowed by law. Requests for additional depositions or discovery may be made to the Arbitrator (as defined below) selected pursuant to this Arbitration Clause. The Arbitrator may grant such additional discovery if the Arbitrator finds that the party has demonstrated that it needs that discovery to adequately arbitrate the claim, taking into account the parties' mutual desire to have a speedy, less-formal, cost-effective dispute-resolution mechanism.

g.   <u>Designation of Witnesses</u>. At least thirty (30) days before the arbitration, the parties must exchange lists of witnesses, including any experts, and copies of all exhibits intended to be used at the arbitration.

h.   <u>Subpoenas</u>. Each party shall have the right to subpoena witnesses and documents to the extent allowed by law, subject to any limitations the Arbitrator may impose for good cause shown.

i.   <u>Place of Arbitration</u>. The arbitration shall take place in the county (or comparable governmental unit) in which Distributor last rendered services to the Company, and no dispute affecting Distributor's rights or responsibilities shall be adjudicated in any other venue or forum.

j.   <u>Arbitration Procedures</u>.

    i.   The arbitration will be held under the auspices of JAMS (or any successor) in accordance with the JAMS Streamlined Arbitration Rules and Procedures (and no other rules), which are currently available at http://www.jamsadr.com/rules ("JAMS Rules"). The Company will supply Distributor with a printed copy of those rules upon request. Notwithstanding any provision of the JAMS Rules, any dispute over the formation, enforceability, validity, or severability of any provision of this Arbitration Clause shall be resolved by a court of competent jurisdiction.

    ii.   The Arbitrator shall be either a retired judge, or an attorney who is experienced in the subject matter at issue and licensed to practice law in the state in which the arbitration is convened (the "Arbitrator"), selected pursuant to JAMS Rules or by mutual agreement of the parties.

    iii.   The Arbitrator shall apply the substantive law (and the law of remedies, if applicable) of the state in which the claim arose, or federal law, or both, as applicable to the claim(s) asserted. The Arbitrator is without jurisdiction to apply any different substantive law or law of remedies. The Federal Rules of Evidence shall apply. The arbitration shall be final and binding upon the parties, except as provided in this Arbitration Clause.

    iv.   The Arbitrator shall have jurisdiction to hear and rule on pre-hearing disputes and is authorized to hold pre-hearing conferences by telephone or in person, as the Arbitrator deems advisable. The Arbitrator shall have the authority to entertain a motion to dismiss and/or a motion for summary judgment by any party and shall apply the standards governing such motions under the Federal Rules of Civil Procedure.

Distributor Initials _____

**EXHIBIT A, PAGE 10**

      v.  Either party, at its expense in the first instance, may arrange and pay for a court reporter to provide a stenographic record of proceedings.

      vi.  Should any party refuse or neglect to appear for, or participate in, the arbitration hearing, the Arbitrator shall have the authority to decide the dispute based upon whatever evidence is presented.

      vii.  Either party upon its request shall be given leave to file a post-hearing brief. The time for filing such a brief shall be set by the Arbitrator.

      viii.  The Arbitrator shall render an award and written opinion, normally no later than thirty (30) days from the date the arbitration hearing concludes or the post-hearing briefs (if requested) are received, whichever is later. The opinion shall include the factual and legal basis for the award.

k.  <u>Arbitration Fees and Costs</u>. Unless otherwise required by law, the parties will share equally, any JAMS fees and the fees of the arbitrator. If required by law, however, the Company will be responsible for advancing, in the first instance, any filing fee and the fees and costs of the Arbitrator; provided, however, that in that event, if Distributor is the party initiating the claim, Distributor will contribute an amount equal to the filing fee to initiate a claim in the court of general jurisdiction in the state in which Distributor last rendered services to the Company; and, provided further, that at the conclusion of the arbitration, the Company to the maximum extent permitted by law shall be entitled to recoup from Distributor any filing or arbitrator's fee that, based on the results of the arbitration, the Company should not have been required to advance in the first instance. Each party shall pay in the first instance its own litigation costs and attorneys' fees, if any. However, if any party prevails on a statutory claim that affords the prevailing party attorneys' fees and litigation costs, or if there is a written agreement providing for attorneys' fees and/or litigation costs, the Arbitrator shall rule upon a motion for attorneys' fees and/or litigation costs under the same standards a court would apply under the law applicable to the Claim(s) at issue.

l.  <u>Reconsideration and Review</u>. Either party shall have the right, within twenty (20) days of issuance of the Arbitrator's decision, to file with the Arbitrator (and the Arbitrator shall have jurisdiction to consider and rule upon) a motion to reconsider (accompanied by a supporting brief), and the other party shall have twenty (20) days from the date of the motion to respond. The Arbitrator thereupon shall reconsider the issues raised by the motion and, promptly, either confirm or change the decision.

m.  <u>Enforcement of Arbitration Clause</u>. Either party may bring an action in any court of competent jurisdiction to compel arbitration under this Arbitration Clause and to enforce an arbitration award.

n.  <u>Interstate Commerce</u>. Distributor understands and agrees that the Company is engaged in transactions involving interstate commerce and that Distributor's services are related to that interstate commerce.

o.  <u>Survival of Agreement</u>. This Arbitration Clause will survive the termination of the Agreement.

p.  <u>Sole and Entire Agreement</u>. This is the complete agreement between the parties on the subject of arbitration of disputes; provided, however, that if this Arbitration Clause for any reason is held to be unenforceable, then any prior arbitration agreement between the Company and Distributor shall survive. No party is relying on any representations, oral or written, on the subject of the effect, enforceability or meaning of this Arbitration Clause, except as specifically set forth in this Arbitration Clause.

q.  <u>Construction and Severability</u>. If any provision of this Arbitration Clause is adjudged to be void or otherwise unenforceable, in whole or in part, such adjudication shall not affect the validity of the remainder of the Arbitration Clause. All other provisions shall remain in full force and effect based on the parties' mutual intent to create a binding agreement to arbitrate their disputes.

r.  **<u>Voluntary Agreement</u>. Distributor acknowledges that Distributor has carefully read this Arbitration Clause, that Distributor understands its terms, that all understandings and agreements between the Company and Distributor relating to the subjects covered in the Arbitration Clause are contained in it, and that Distributor has entered into the Arbitration Clause and agreed to the provisions of the Arbitration Clause voluntarily and not in reliance on any promises or representations by the Company other than those contained in this Arbitration Clause.**

Distributor Initials

**EXHIBIT A, PAGE 11**

| | | |
|---|---|---|
| | | s. **No Court or Jury Trial.**  Distributor understands that, by signing this Arbitration Clause, Distributor is giving up any right to a court or jury trial. |
| **Item 10** | **16.** | **General Terms.** |

a.  Notices.  Except to the extent oral notices are expressly permitted herein, all notices and other communications must be in writing and will be deemed to have been given if delivered personally, sent by facsimile (with confirmation), mailed by certified mail postage prepaid, delivered by an overnight delivery service (with confirmation), or sent by electronic mail (with confirmation sent by certified mail on or prior to the next business day) to the parties at the addresses, facsimile numbers, or email addresses set forth below (or at such other address or facsimile number as a party may designate by like notice to the other parties):

**If to Company:**
Gruma Corporation
Attn: Legal Department
5601 Executive Dr. Ste. 800
Irving, Texas 75038
Fax No.: 972.232.5034

With an electronic copy in PDF format to legal@missionfoods.com

**If to Distributor:**
Notices may be provided at any address or email of the Distributor provided on this Agreement, or if this Agreement does not provide any address, notices may be provided to any address of Distributor (physical, fax, telephone, electronic, or otherwise) publicly available.

Any notice or other communication will be deemed to be given (a) on the date of personal delivery, (b) at the expiration of the third (3rd) day after the date of deposit in the United States mail, (c) upon sending the electronic mail, or (d) on the date of confirmed delivery by facsimile or overnight delivery service.

b.  Entire Agreement; Amendment.  This Agreement constitutes the entire agreement between the parties concerning the Store Door distribution of the Products to the Eligible Customers and supersedes all prior and contemporaneous agreements between the parties relating to such subject matter (including, without limitation, any jobber or distributor agreement previously entered into between or binding upon the parties hereto which relates to the Store Door distribution of the Products to the Eligible Customers, whether oral or in writing); provided, however, that if for any reason the Arbitration Clause is held to be unenforceable in whole or in part, any prior arbitration agreement between the parties shall survive and be enforceable.  Neither party is relying upon any warranties, representations, or inducements not set forth herein.  This Agreement may be amended only by an instrument in writing signed by both parties which expressly refers to this Agreement and specifically states that it is intended to amend it.  However, Distributor agrees not to unreasonably withhold Distributor's written consent to any amendment to this Agreement proposed by Company to Distributor and to all other Company Store Door distributors of the Products servicing the Facility Service Area who are similarly situated, so long as such amendment does not have a material adverse effect upon Distributor's rights or obligations hereunder.

c.  Controlling Agreement.  In the event of any conflict between the provisions of this Agreement and the provisions contained in any order form, invoice, or other form used by Company or by Distributor, the provisions of this Agreement control.

d.  Severability.  If for any reason any one or more of the provisions of this Agreement is held to be inoperative, unenforceable, or invalid, as applied to any particular case or in all cases, such circumstance will not have the effect of rendering the provision inoperative, unenforceable, or invalid in any other case or of rendering any of the other provisions of this Agreement inoperative, unenforceable, or invalid.

e.  Number and Gender.  All pronouns and any variations thereof are deemed to refer to the masculine, feminine, or neuter and to the singular or plural as the identity of the person or persons, firm or firms, or corporation or corporations referred to may require.

f.  Waiver.  No term or provision of this Agreement will be deemed waived, and no breach excused, by failure of either party to insist in any instance upon strict performance of any term or condition of this Agreement, unless such waiver or consent is in writing and signed by the party claimed to have waived or consented.  Any consent

Distributor Initials

by either party to, or waiver of, a breach by the other, whether express or implied, will not constitute consent to, waiver of, or excuse for any different or subsequent breach.

g.  <u>Performance Excused</u>. Anything to the contrary herein notwithstanding, a party will not be liable for any delay or failure to perform any of the terms or provisions of this Agreement if the delay or failure is caused by government restrictions or regulations, transportation conditions, labor or material shortages, labor disputes, strikes, wars, riots, insurrections, fires, floods, storms, accidents, acts of God, failures of crops or supplies, or any other causes beyond the party's reasonable control. However, notwithstanding anything herein to the contrary, under no circumstances must the timely payment of any amount due hereunder be excused.

h.  <u>Governing Law</u>. Except as provided in Section 15 (a), this Agreement shall be governed by and construed in accordance with the laws of the state in which the Distributor last worked for the Company.

i.  <u>Electronic Execution of Documents</u>. The parties agree that this Agreement, or any other document by or between the parties, may be signed in counterparts, as well as through the electronic signature of each party, including through Adobe Sign or DocuSign services, which will have the same legal effect, validity, and enforceability as a manually executed original of such document, to the extent and as provided for in any applicable law, rule, or regulation governing electronic signatures, including the Federal Electronic Signatures in Global and National Commerce Act of 2000, the Texas Electronic Transactions Act, or any other similar law, rule, or regulation based on the Uniform Electronic Transactions Act, in each case including any duly adopted amendments thereto.

j.  **<u>Agreement Fully Understood</u>.   DISTRIBUTOR ACKNOWLEDGES AND REPRESENTS THAT DISTRIBUTOR VOLUNTARILY AND KNOWINGLY EXECUTED THIS AGREEMENT AFTER DISTRIBUTOR HAD AMPLE OPPORTUNITY TO CONSULT WITH DISTRIBUTOR'S OWN LEGAL COUNSEL.   DISTRIBUTOR REPRESENTS THAT DISTRIBUTOR KNOWS AND FULLY UNDERSTANDS THE CONTENTS OF THIS AGREEMENT AND AGREES TO ABIDE BY ALL TERMS AND CONDITIONS OF THIS AGREEMENT.**

k.  <u>Construction</u>. Neither party to this Agreement will be deemed to be the drafter of any of the provisions of this Agreement. No party hereto will thus take any position in any dispute resolution proceeding or otherwise that any vague or ambiguous provisions of this Agreement should be construed against another party simply because such other party may have actually drafted such provision.

Distributor Initials _____

**EXHIBIT A, PAGE 13**

# EXHIBIT B

 # STORE DOOR DISTRIBUTOR AGREEMENT

THIS AGREEMENT is made and entered into effective as of **April 17 / 2008**

by and between Gruma Corporation, a Nevada corporation d/b/a Mission Foods, Guerrero Mexican Food Products, etc. ("Company") and, CityWide Consultants Food Management LLC, a Corporation ("Distributor"), TAX ID: XX-XXX7382 .

## RECITALS

WHEREAS, Company is currently engaged in the production of corn and flour tortillas, tortilla chips, and other food products; and

WHEREAS, Distributor represents that Distributor possesses the equipment, facilities, and ability to promote, distribute, and sell via a store door delivery system certain of the food products produced or distributed by Company, and that Distributor desires to distribute and sell such food products via such system to certain eligible customers and to such additional eligible customers as Distributor shall develop in conducting Distributor's own business; and

WHEREAS, Company desires to appoint Distributor as Company's exclusive store door sales distributor for certain of its food products to certain eligible customers, and Distributor is willing to accept such appointment, all pursuant to the terms and conditions set forth in this Agreement;

NOW, THEREFORE, for and in consideration of the foregoing recitals and the mutual covenants and obligations of the parties as herein contained, it is mutually agreed as follows:

## AGREEMENT

1. **Definitions.**

   For purposes of this Agreement, the following terms (when capitalized) shall have the meanings indicated:

   a. **Additional Customers.**

   "Additional Customers" shall mean any and all customers which are listed as such on Exhibit A-3 hereto.

Initials_____

Initials_____

 **STORE DOOR DISTRIBUTOR AGREEMENT**

b.   **Adequate Service.**

"Adequate Service" shall mean such service as is reasonably expected by Distributor's customers and as is necessary to preserve the reputation of the Products for freshness and high quality.  In the case of service to a customer which is a retail food store, "Adequate Service" includes, without limitation, the following:

i.   Fulfilling on a due and timely basis any reasonable requirements or requests communicated by the store to Distributor, whether relating to delivery or merchandising of the Products, invoicing of the Products to the store, or otherwise.

ii.   Stocking of shelves with an adequate supply of the full line of Products (including, without limitation, Related Private Label products and Related Ancillary products) authorized for sale to the store, rotation of Products previously stocked, and removal of Unsaleables, all at such intervals (generally, daily) as shall be expected by the store from time to time.

iii.   Removing of all Stales from the store by the applicable code dates.

iv.   Installing at the store any permanent display racks, temporary promotional displays, or point-of-sale materials appropriate and acceptable to the store which Company makes available to Distributor from time to time.

v.   Making arrangements (through a "beeper," answering service, staffed office, or otherwise) to enable the store to contact Distributor at any reasonable time on an expeditious basis to communicate complaints or requests for emergency service.

c.   **Company's Facility.**

"Company's Facility" shall mean Company's distribution facility (which may or may not also be a manufacturing facility) located at

9121 Pittsburgh Av, Suite 102

Rancho Cucamonga, CA 91730,

and/or such other distribution facility of Company located reasonably convenient to the Territory as Company shall designate from time to time.

d.   **Eligible Customers.**

"Eligible Customers" shall mean and include (i) all customers or potential customers for the Products which are located within the Territory, exclusive of Excluded Customers; and (ii) all Additional Customers.  For purposes of this Agreement, customers shall be deemed to be "located" at the locations of the retail outlets, residences, places of business, or other locations of such customers where they sell, use, or consume the Products purchased by them.  In the event of any dispute as to the "location" of a particular customer, Company's reasonable determination shall be controlling.

e.   **Excluded Customers.**

1002 -- Ap#550 - CityWide Consultants Food Management LLC

XX-XXX7382

Initials _____

Initials _____

**EXHIBIT B, PAGE 15**



# STORE DOOR DISTRIBUTOR AGREEMENT

"Excluded Customers" shall mean any and all customers which are designated as such on Exhibit A-2 hereto. Except to the extent otherwise specified on Exhibit A-2 hereto, all Food Service Customers shall be deemed "Excluded Customers."

f.    Facility Service Area.

The "Facility Service Area" shall mean and include the geographical area which is serviced (in terms of Store Door distribution of the Products) from Company's Facility, as reasonably determined by Company from time to time. However, to the extent reasonably determined by Company from time to time, the "Facility Service Area" may exclude areas which are geographically remote from Company's Facility, but which may nonetheless be serviced (in terms of Store Door Distribution of the Products) from Company's Facility.

g.    Food Service.

"Food Service" products shall mean any products (including, without limitation, products bearing the Marks) produced or distributed by Company from time to time which are packaged for sale to Food Service Customers.

h.    Food Service Customers.

"Food Service Customers" shall mean and include restaurants, hospitals, schools, food manufacturers or processors, and other institutional customers purchasing the Products for purposes other than resale at retail in the same packaging as when purchased by them.

i.    Formula Value.

The "Formula Value" as of any particular time shall mean an amount equal to ___2___ times the average weekly net sales of Products from Company to Distributor (and/or to any other distributor(s) previously servicing the Eligible Customers) for resale to customers which are then (i.e., at the time as of which the "Formula Value" is being determined) Eligible Customers over the last ten full weeks preceding the date in question (as reasonably determined by Company on the basis of Company's net invoice charges to Distributor and/or to any other distributor(s) previously servicing the Eligible Customers). The parties acknowledge and agree that the "Formula Value" as of any particular time is a reasonable approximation of the fair market value of Distributor's rights under this Agreement as of such time (before taking into account any effects on such value of Subsection 10(b) hereof).

j.    Initial Formula Value.

The "Initial Formula Value" shall mean __$1,200.00___, which is equal to (unless otherwise agreed between Company and Distributor, any such agreement being evidenced by the insertion of a different value into the blank set forth in this sentence) (i) the Formula Value as of the effective date of this Agreement, if Distributor acquired Distributor's rights hereunder directly from Company, or (ii) the Initial Formula Value set forth in the Store Door Distributor Agreement between Company and Distributor's predecessor-in-interest, if Distributor acquired Distributor's rights hereunder through assignment from a predecessor-in-interest. The "Initial Formula Value" shall not be affected in any way by any Territory Adjustment effected pursuant to the provisions of Subsection 2(b) or Subsection 2(c) hereof.

Initials_____

Initials_____

# STORE DOOR DISTRIBUTOR AGREEMENT

k.  **Marks.**

"Marks" shall mean the trademark(s) listed on Exhibit A-4 hereto, or such other trademark or trademarks as Company may, from time to time for reasonable cause (including, without limitation, actual or alleged trademark infringement), elect to use in the Facility Service Area in its (their) place.

l.  **Material Customer.**

"Material Customer" shall mean any Eligible Customer which is a chain retail food store or other material retail food store, or has Company-approved credit for purposes of Subsection 4 (d) hereof.

"Products" or "the Products" shall mean and include all products sold by Company bearing the Marks which Company makes available from time to time for Store Door distribution within the Facility Service Area; provided, however, that (i) the Products shall include all Related Private Label products and all Related Ancillary products, and (ii) the Products shall exclude all Food Service products and all Refrigerated products (whether or not such products bear the Marks). It is understood and agreed that Company may, at any time and from time to time in its sole and absolute discretion, change the types of products sold by Company bearing the Marks and/or the specifications of such products, as well as the types of products bearing the Marks which Company makes available for Store Door distribution within the Facility Service Area.

n.  **Proprietary Rights.**

Company's "Proprietary Rights" shall have the meaning set forth in Section 12 hereof.

o.  **Refrigerated.**

"Refrigerated" products shall mean and include all products (whether or not such products bear the Marks) which are intended to be sold to the ultimate consumer in a refrigerated or frozen state.

p.  **Related Ancillary.**

"Related Ancillary" products shall mean and include any and all products not bearing the Marks which Company shall reasonably designate from time to time for distribution by Company's Store Door distributor(s) for the Products servicing the Facility Service Area. "Related Ancillary" products shall not include, however, any Related Private Label products.

q.  **Related Private Label.**

"Related Private Label" products shall mean and include any and all products produced or distributed by Company for sale under trademarks belonging to or reserved exclusively for sales to particular retail food stores (or retail food store chains) serviced by Distributor hereunder which Distributor is requested (by Company or by the stores or store chains in question) to supply to such stores (or store chains). In this connection, Distributor covenants and agrees not to sell Related Private Label products bearing any particular trademarks to any customers other than the particular stores (or store chains) which own the trademarks in question or for which such trademarks have been reserved.

r.  **Stales.**

"Stales" shall mean any Products which become out of code while in the possession of Distributor or any retail store serviced by Distributor hereunder.

4/7/2008

Page 4 of 30

1002 -- Ap#550 - CityWide Consultants Food Management LLC

XX-XXX7382

Initials _____

Initials _____

**EXHIBIT B, PAGE 17**



# STORE DOOR DISTRIBUTOR AGREEMENT

s.    Store Door.

"Store Door" distribution shall mean and include any distribution of the Products whereby the Products are delivered directly to the customer's retail store or other location where the Products are intended to be resold, used, or consumed. However, in the context of distribution to retail food stores, "Store Door" distribution shall mean only that type of distribution which involves full in-store service, including seeking permanent and temporary shelf or display space from the store, stocking such space with Products, rotating the Products, removing Stales and Unsaleables, and utilizing point-of-sale materials to the extent provided by Company and permitted by the store. "Store Door" distribution shall specifically exclude, without limitation, Warehouse distribution.

t.    Territory.

The "Territory" shall mean and include the geographical area specified as such on Exhibit A-1 hereto.

u.    Territory Adjustment.

"Territory Adjustment" shall have the meaning set forth in Subsection 2(c) hereof.

v.    Warehouse.

"Warehouse" distribution shall mean and include any distribution of the Products whereby the Products are delivered or shipped to a central warehouse for redistribution to various retail food stores or other locations where the Products are resold, used, or consumed. "Warehouse" distribution shall also include any distribution of Products to customers through pallet deliveries, irrespective of whether such deliveries are made to central warehouses or to the particular retail food stores or other locations where the Products are resold, used, or consumed.

w.    Unsaleables.

"Unsaleables" shall mean any Products which become damaged or otherwise unsaleable (for reasons other than being out of code) while in the possession of Distributor or any retail store serviced by Distributor hereunder.

Initials_____

Initials_____

EXHIBIT B, PAGE 18



# STORE DOOR DISTRIBUTOR AGREEMENT

2.    **Distributorship and Territory Adjustments.**

    a.    **Exclusive Appointment.**

Subject to the terms and conditions of this Agreement, Company hereby appoints Distributor as Company's exclusive Store Door distributor for the Products to Eligible Customers. Company agrees that, during the term of this Agreement, it will not appoint any other or different person, firm, or corporation to act as its Store Door distributor for the Products to any Eligible Customers. Company may, however, either directly or through one or more distributors, jobbers, or representatives appointed by it, distribute products similar to or competitive with the Products (including, without limitation, tortillas, tortilla chips, or other food products bearing trademarks other than the Marks, as well as Food Service or Refrigerated products bearing the Marks) to Eligible Customers or distribute the Products to Eligible Customers through any means other than Store Door distribution. Distributor hereby accepts the appointment as Company's exclusive Store Door distributor for the Products to Eligible Customers, all subject to the terms and conditions of this Agreement. Distributor agrees not to sell or distribute, either directly or indirectly, the Products, or any of them, to any customers who are not Eligible Customers or through any method of distribution other than Store Door distribution.

    b.    **Uncompensated Territory Adjustments.**

Should Distributor fail to provide Adequate Service to any particular Eligible Customers requesting or receiving Store Door distribution of the Products from Distributor, or to the Eligible Customers requesting or receiving Store Door distribution of the Products from Distributor which are located within any particular geographical region of the Territory, and should such failure continue without cure for a period of 48 hours after Distributor's receipt of oral or written notice thereof from Company or be followed by another failure (whether or not similar to the initial failure) affecting any of the Eligible Customers in question at any time within nine months after Distributor's receipt of such oral or written notice; or should any Eligible Customers willing to accept Store Door distribution of the Products from another of Company's distributors refuse to accept Store Door distribution of the Products from Distributor; then, in either case, Company may thereupon, at its sole option, upon written notice to such effect to Distributor, and without thereby incurring any liability to Distributor or prejudicing any other rights or remedies of Company hereunder (including, without limitation, under Section 10 hereof), add the customers in question to the list of Excluded Customers or delete the geographical region in question from the Territory.

    c.    **Compensated Territory Adjustments.**

Company shall have the absolute right, in its sole discretion, at any time and from time to time during the term of this Agreement, upon not less than 14 days' prior written notice to Distributor, to add to or delete from the Territory, the Excluded Customers, and/or the Additional Customers (i.e., to make a "Territory Adjustment"), except that should Company exercise such right, Company shall thereupon become obligated to pay to Distributor, in cash, within 30 days after the date of the Territory Adjustment, an amount equal to the excess (if any) of (i) the Formula Value immediately prior to the Territory Adjustment over (ii) the Formula Value immediately after the Territory Adjustment. Anything to the contrary herein notwithstanding, Company shall not make any Territory Adjustment pursuant to this Subsection 2(c) which would reduce the Eligible Customer base to a level insufficient to require the services of the equivalent of at least one full-time route driver in performing Distributor's obligations hereunder plus any distribution of other products then being handled by Distributor, all as determined by Company in its reasonable discretion.

3.    **Term of Agreement.**

Initials_____

Initials_____



# STORE DOOR DISTRIBUTOR AGREEMENT

The term of this Agreement and the appointment of Distributor hereunder shall commence on the effective date hereof and shall continue until such time as this Agreement is terminated pursuant to the provisions of Section 10 hereof.

4.   **Sale of Products.**

a.   **Sale and Delivery.**

Company agrees to sell to Distributor, and Distributor agrees to buy from Company, sufficient quantities of the Products to service the Eligible Customers with Store Door distribution of the Products. Except to the extent otherwise agreed between Company and Distributor from time to time, Company shall deliver the Products to Distributor, and Distributor shall pick up the Products, at Company's Facility or at a warehouse or drop point reasonably convenient to the Territory designated by Company from time to time. To the extent that Distributor picks up the Products from Company's Facility or from a warehouse maintained by Company, Distributor shall pick up the Products during the hours in which such facility is open for pick-up. Any Product shortages or damaged Products must be reported to Company within 48 hours of the time the Products in question are made available by Company for pick-up by Distributor; otherwise, Company's records as to Products delivered to Distributor shall be controlling, and all Products delivered to Distributor shall conclusively be deemed to have been undamaged at the time of delivery. Title and risk of loss to the Products shall pass to Distributor upon delivery of the Products to Distributor. Company agrees to use its best efforts to fill Distributor's orders in a reasonable and timely fashion. In the event of strikes, material shortages, breakdowns, or similar occurrences, Company reserves the right to fill orders for the Products on such reasonable basis as Company shall determine.

b.   **Price.**

The prices for all Products which Distributor purchases hereunder shall be as set forth on Company's standard distributor price list for Store Door distributors of the Products of use and volume similar to Distributor servicing customers within the Facility Service Area, as in effect from time to time (including any special discounts or promotional allowances made available by Company to such distributors generally, as in effect from time to time). It is understood and agreed that Company may, in its sole discretion, change any or all of the prices on such price list at any time and from time to time upon 30 days' prior written notice to Distributor. However, Company agrees that the suggested distributor mark-ups from such price list for any and all products which are, as of the effective date of this Agreement, included among the Products, shall not be reduced below the percentages specified on Exhibit B hereto, unless and until similar reductions in such suggested distributor mark-ups are effected for all other Store Door distributors of the Products of use and volume similar to Distributor within the Facility Service Area. Should Company hereafter introduce any new Products for distribution under this Agreement, the suggested distributor mark-ups for such new Products shall be as specified by Company at the time of such introduction, subject to later adjustment under the circumstances described in the preceding sentence. For purposes of this Subsection 4(b), the "suggested distributor mark-up" applicable to Distributor for any particular Product shall be calculated as a percentage of the cost of such Product to Distributor, as set forth on Company's standard distributor price list applicable to Distributor after taking into account any reductions in such price list due to special discounts or promotional allowances.

Suppose, for example, that Distributor's suggested distributor mark-up for a particular Product were 21.95% and that Distributor's cost for such Product were $0.82 per unit. Under these circumstances, Distributor's price to Distributor's customers would be $1.00 per unit, assuming that Distributor chose to follow the suggested distributor mark-up for such Product. Suppose, however, that Company ran a special promotion on such Product and reduced Distributor's cost for such Product to $0.41 per unit. Under these circumstances, Distributor's price to Distributor's customers would be $0.50 per unit, assuming that Distributor chose to follow the suggested distributor mark-up for such Product.

1002 – Ap#550 - CityWide Consultants Food Management LLC

XX-XXX7382

Initials_____

Initials_____

**EXHIBIT B, PAGE 20**

 **STORE DOOR DISTRIBUTOR AGREEMENT**

c.    **Payment Terms; Service Charges.**

Distributor shall pay Company in full for all Products delivered to Distributor hereunder within 14 days of the date established on the invoice. For purposes of this Agreement, payments by Distributor shall be deemed to be made at the times they are actually received by Company. Payments not made on a timely basis will be subject to a service charge, computed at the rate of 1-½ % per month. Distributor agrees that it would be impractical and extremely difficult to fix precisely the amount of loss which Company would sustain in the event of late payments by Distributor (which loss could include, without limitation, loss of accounting and management time and loss of use of money), and further agrees that the foregoing service charge is a reasonable estimate of Company's foreseeable loss. If, at any time, the financial responsibility of Distributor should become impaired or unsatisfactory to Company or, in Company's reasonable opinion, inadequate to meet Distributor's obligations hereunder, or if at any time Distributor should fail to pay for any Products on a timely basis, Company may, at its sole option, change or withdraw the foregoing terms of credit, it being understood that if such terms of credit are withdrawn, Company, at its option, may require cash or satisfactory security before making deliveries under this Agreement. However, Company reserves the right to inspect at any particular time, Distributor's invoices to Customers, agreements with Customers (whether written or oral), Customer complaints, communications with Customers, or any business records relating to Distributor's performance in this Agreement.

d.    **Payments With Invoices.**

Company may, at its option, accept as payment from Distributor hereunder the assignment of invoices generated by Distributor from sales to Eligible Customers. The delivery by Distributor to Company of any such invoices and Company's acceptance of same shall be deemed an assignment of the invoices in question to Company, and the net balances shown as owing on such invoices shall be credited to Distributor's account with Company. However, any net balances which are ultimately not collected on any such invoices due to Distributor's error or alleged error shall be charged back to Distributor. Should the total of the net balances of all invoices assigned by Distributor Company hereunder during any particular calendar week exceed the total of all amounts charged to Distributor by Company during such calendar week (including, without limitation, amounts charged to Distributor for Products delivered to Distributor during such calendar week), then Company shall pay the excess to Distributor no later than the second Friday following the expiration of the calendar week in question. In general, Company will require that all invoices assigned to it list Company as the payee, be compatible with Company's computerized accounting system, be payable by Eligible Customers with Company-approved credit (which credit approval Company may withhold at any time for any reason), and meet the customer's requirements for payment. All invoices assigned by Distributor to Company shall be collectible by Company, but should any customer make any payment on any such invoice to Distributor, Distributor shall deliver such payment to Company within 24 hours of Distributor's receipt of same. Distributor hereby represents and warrants that all invoices assigned to Company pursuant to the terms of this Subsection 4(d) shall at all times be free and clear of any liens, security interests, encumbrances, or charges of any kind which are granted or created by Distributor or which arise out of any actions by or claims against Distributor.

1002 – Ap#550 - CityWide Consultants Food
Management LLC
XX-XXX7382

Initials_____

Initials_____

**EXHIBIT B, PAGE 21**



# STORE DOOR DISTRIBUTOR AGREEMENT

5.    **Company's Obligations.**

During the term of this Agreement, Company shall have the following obligations:

a.    **Selling Aids, Supplies, and Promotions.**

Company may supply to Distributor, from time to time, without cost, reasonable quantities of Company's advertising and selling literature, drawings, samples, temporary promotional displays, permanent display racks, and other promotional aids and supplies, as designed and made available by Company, which would be helpful in selling the Products to Eligible Customers. Distributor acknowledges that all temporary promotional displays or permanent display racks at any time previously supplied or hereafter to be supplied by Company to Distributor or any previous distributors, jobbers, or route sales personnel servicing any or all of the Eligible Customers are and shall be and remain the sole property of Company. Distributor further acknowledges that Company may, at its option, require that any or all temporary promotional displays (but not permanent display racks) from time to time supplied to Distributor by Company either be returned to Company or be paid for by Distributor.

b.    **Trays and Boxes.**

Company shall use its best efforts to maintain a sufficient inventory of plastic trays and corrugated packing boxes to enable it to fill all reasonable requests for such trays and boxes as shall be placed by Distributor. All such trays and packing boxes delivered by Company to Distributor shall remain the property of Company. Due to the high cost of plastic trays, Distributor shall be required to return such trays to Company and account to Company for missing or damaged trays. Distributor may also be required to return corrugated packing boxes to Company and/or account to Company for missing boxes. As an alternative to the foregoing, Company may charge Distributor for plastic trays and/or corrugated packing boxes delivered to Distributor and credit Distributor's account with Company for trays and/or boxes which are returned in good condition. Moreover, Company reserves the right to require that Distributor provide Company with a reasonable deposit as a condition to releasing plastic trays or corrugated packing boxes to Distributor.

6.    **Distributor's Representatives.**

It is contemplated that Distributor may appoint or otherwise designate suitable and desirable employees, agents, helpers, and representatives for purposes of performing any or all of Distributor's obligations hereunder (herein collectively referred to as "Distributor's Representatives"). Distributor shall be solely responsible for all Distributor's Representatives and their acts. No Distributor's Representative shall have any claim against Company for salaries, commissions, items of cost, workers compensation or unemployment insurance benefits, or other forms of compensation, reimbursement, or benefits.

7.    **Distributor's Obligations.**

During the term of this Agreement, Distributor shall have the following obligations:

a.    **Selling Effort.**

Distributor shall use Distributor's best efforts to distribute the Products on a Store Door basis to Eligible Customers and to develop the Store Door sales potential of the Eligible Customers.

1002 → Ap#550 - CityWide Consultants Food Management LLC
XX-XXX7382

Initials_____

Initials_____

**EXHIBIT B, PAGE 22**



# STORE DOOR DISTRIBUTOR AGREEMENT

In this connection, Distributor shall provide Adequate Service to all Material Customers that request Store Door distribution of the Products. In the event that Distributor should fail to service the Eligible Customers on any day on which the Eligible Customers reasonably expect to be serviced, Company may, at Company's sole option, service the Eligible Customers on such day on Distributor's behalf, it being understood and agreed that (i) all proceeds of sales effected by Company on Distributor's behalf shall belong to Distributor, (ii) all losses due to Stales or Unsaleables picked up by Company from Eligible Customers shall (subject to the provisions of Section 9 hereof) be borne by Distributor, (iii) Distributor shall be assessed a reasonable charge by Company for servicing the Eligible Customers on Distributor's behalf, and (iv) the fact that Company may choose to service Eligible Customers on Distributor's behalf shall not prejudice any other rights or remedies which Company might otherwise have under this Agreement (including, without limitation, under Section 10 hereof) by virtue of Distributor's breach of Distributor's obligations hereunder.

b.   **Uniforms.**

Neither Distributor nor any Distributor's Representatives shall be required to wear uniforms. However, Distributor shall insure that all persons engaged in performing Distributor's obligations hereunder comply, at all times they are in public view, with any reasonable minimum dress or grooming standards which Company shall promulgate from time to time, thereby helping to preserve the goodwill of the business associated with the Marks and Company's image in the community.

c.   **Prohibited Sales and Deliveries.**

Except to the extent otherwise provided in this Subsection 7(c), Distributor shall not, without the express prior written consent of Company, market, promote, solicit orders for, sell, or deliver any products which are competitive with the Products. Distributor may, however, handle noncompetitive products. In the event that (i) Company should introduce a new Product for distribution hereunder which is competitive with any product which Distributor is handling at the time of such introduction, and (ii) the product which Distributor is handling was not previously competitive with any of the Products, then Distributor may continue handling the product in question for a period of 60 days after the introduction of the new Product. At the end of the 60-day period, Distributor shall (absent Company's express written agreement to the contrary) cease handling the product in question, unless Distributor shall have, prior to the expiration of the 60-day period, given Company notice of the termination of this Agreement pursuant to Subsection 10(b) hereof, in which event Distributor may continue handling the product in question until 30 days after the date of such notice. Should a dispute arise between Company and Distributor as to whether any product being handled by Distributor (or proposed to be handled by Distributor) is "competitive" with the Products, Company's reasonable determination shall be controlling.

d.   **Delivery Vehicles.**

Distributor shall provide and maintain Distributor's own vehicles for the delivery of Products by Distributor (or by Distributor's Representatives) to Eligible Customers. Distributor shall ensure that such vehicles are maintained in good condition and repair, that such vehicles are kept in clean and sanitary condition and in full compliance with all applicable health, safety, and other laws or regulations, and that such vehicles collectively have sufficient capacity to adequately service the Eligible Customers. Distributor shall permit Company to inspect such vehicles from time to time upon Company's request to confirm Distributor's compliance with Distributor's obligations pursuant to the preceding sentence.

1002 – Ap#550 - CityWide Consultants Food Management LLC
XX-XXX7382

Initials _____

Initials _____

**EXHIBIT B, PAGE 23**



# STORE DOOR DISTRIBUTOR AGREEMENT

e.    <u>Vehicle Insurance.</u>

Distributor shall maintain liability insurance satisfactory to Company on all vehicles used by Distributor (or by Distributor's Representatives) for the delivery of Products to Eligible Customers in an amount of not less than $1,000,000 (for each vehicle) combined single limit. Distributor shall ensure that at all times Company is provided with a current certificate of insurance under each such policy naming Company as an additional insured.

f.    <u>Distributor Information.</u>

To enable Company to comply with any applicable tax reporting requirements or other legal requirements affecting Company's relationship with Distributor, Distributor shall at all times keep Company informed as to Distributor's current name, address, and Social Security number and as to the current names, addresses, and Social Security numbers of all Distributor's Representatives assisting in the performance of Distributor's obligations hereunder.

g.    <u>Hand-Held Computerized Accounting Systems.</u>

Company may, at its option, make available for Distributor's use one or more hand-held computerized accounting systems to assist Distributor in performing Distributor's obligations hereunder.  In the event that Company shall make such a system or systems available to Distributor, Distributor may be required to use such system or systems (or a similar system or systems purchased, maintained, and updated at Distributor's sole expense so as to be compatible at all times with Company's computerized accounting system) to generate any invoices to be assigned to Company pursuant to Subsection 4(d) hereof, it being understood and agreed that Company may refuse to accept assignment of any hand-written invoices or other invoices that are incompatible with Company's computerized accounting system. Distributor shall be assessed a reasonable installation charge for any such system made available to and used by Distributor, as well as a reasonable weekly or monthly rental charge (which weekly or monthly rental charge may also cover charges for paper, software updates, maintenance, insurance, and/or other related costs).  All equipment provided to Distributor pursuant to the terms of this Subsection 7(g) shall remain the sole property of Company, and Distributor shall be responsible for all damage thereto or loss thereof (except to the extent that such damage or loss shall be covered by proceeds of insurance payable to Company) and shall return same to Company in good condition and repair, ordinary wear and tear excepted, upon the termination of this Agreement.

h.    <u>Compliance with Law.</u>

Distributor shall comply with (and shall cause all Distributor's Representatives to comply with) all laws relating to Distributor's relationships with Distributor's customers, Distributor's relationships with Distributor's Representatives, or Distributor's operations hereunder, including, without limitation, applicable laws relating to theft, dishonest or deceptive acts, health and safety, vehicle licensing, driver licensing, business licenses, price discrimination, immigration, wages and hours, worker's compensation, unemployment insurance, and taxes of any kind.

Initials _____

Initials _____



# STORE DOOR DISTRIBUTOR AGREEMENT

i. **Indemnity.**

Distributor shall defend, indemnify, and hold harmless Company, and each of Company's officers, directors, agents, employees, and affiliates, from and against any and all claims, damages, liabilities, losses, costs, and expenses (including, without limitation, court costs and actual attorneys' fees) which may now or hereafter arise out of or relate to (i) any actual or alleged dishonest or deceptive acts, tortious acts (including, without limitation, negligence), or violations of laws committed by Distributor or any Distributor's Representative; (ii) any disputes between Distributor and any Distributor's Representative, any claims by any Distributor's Representative for wages, commissions, items of cost, workers' compensation or unemployment insurance benefits, or other forms of compensation, reimbursement, or benefits, or any other claims made by any Distributor's Representative in any way related to his or her contractual relationship with Distributor or his or her performance on Distributor's behalf of any of Distributor's obligations hereunder; (iii) any income taxes (including estimated taxes), Social Security taxes (including self-employment taxes), payroll taxes, business taxes, and other tax or similar obligations which may be incurred by Distributor in connection with Distributor's performance under this Agreement, including, without limitation, in connection with Distributor's retaining of any Distributor's Representatives to assist Distributor in performing Distributor's obligations hereunder; (iv) any claims by any of Distributor's customers relating to any mistakes or other acts (or alleged mistakes or other alleged acts) of Distributor or any Distributor's Representative; or (v) any breaches by Distributor of this Agreement. The obligations of Distributor under this Subsection 7(i) shall continue irrespective of any termination of this Agreement.

8. **Operations.**

a. **Sales to Distributor's Customers.**

Except to the extent otherwise provided in this Agreement, the pricing of Products sold to Distributor's customers, Distributor's extensions of credit to Distributor's customers, the scheduling of Product deliveries to Distributor's customers, and all other aspects of Distributor's relationships with Distributor's customers shall be determined by Distributor in Distributor's sole discretion, so long as all Material Customers willing to receive Store Door distribution of the Products from Distributor receive Adequate Service.

b. **Stales and Unsaleables.**

Distributor shall dispose of all Stales or Unsaleables picked up by Distributor from retail stores serviced by Distributor or discovered by Distributor in Distributor's inventory in a manner satisfactory to Company. All losses due to Stales or Unsaleables shall (subject to the provisions of Section 9 hereof) be borne by Distributor.

c. **Maintenance of Warehouse.**

Distributor shall keep and maintain adequate warehouse facilities for any inventories of Products Distributor may have on hand from time to time. Distributor shall maintain any such warehouse facilities in clean and sanitary condition and in full compliance with all applicable health, safety, and other laws or regulations.

Further, Distributor shall permit Company to inspect any such warehouse facilities from time to time upon Company's request so as to confirm Distributor's compliance with Distributor's obligations pursuant to this Subsection 8(c). In the event that Company should provide warehouse space to Distributor, Company reserves the right to assess Distributor a reasonable weekly or monthly fee for the use of such space, and Distributor agrees to pay any such fee on a timely basis and to comply with any reasonable rules relating to the use of such space as Company shall establish from time to time.

1002 – Ap#550 - CityWide Consultants Food Management LLC
XX-XXX7382

Initials_____

Initials_____



# STORE DOOR DISTRIBUTOR AGREEMENT

    d.    **Accounting Policies.**

Company shall have the right, subject to the terms of this Agreement, to establish (and/or change) policies regarding the payment of amounts owing by Distributor to Company or by Company to Distributor hereunder, Distributor's total credit limit with Company (such limit to cover all amounts charged to Distributor by Company and not yet paid for by Distributor, including, without limitation, amounts charged to Distributor for Products delivered to Distributor hereunder), and similar accounting matters; and Distributor agrees to abide by all such policies.

9.    **Warranty.**

Company warrants that at the time of delivery to Distributor, all Products sold to Distributor hereunder shall be fit for human consumption, shall have an amount of code left thereon which is reasonable granted the nature of the Products and Company's manufacturing and distribution policies and practices, and shall, within standard variances, conform with any labels contained on the packaging materials accompanying such Products. Furthermore, Company warrants that all Products delivered to Distributor hereunder will remain in saleable condition through the code dates imprinted thereon, provided they are properly handled by Distributor and its customers. COMPANY MAKES NO WARRANTIES, EXPRESS OR IMPLIED, WRITTEN OR ORAL, WITH RESPECT TO THE PRODUCTS EXCEPT THOSE CONTAINED IN THIS SECTION 9. ANY IMPLIED WARRANTIES, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, ARE HEREBY EXPRESSLY DISCLAIMED. DISTRIBUTOR'S SOLE REMEDY FOR ANY BREACH BY COMPANY OF THE WARRANTIES SET FORTH IN THIS SECTION 9 SHALL BE REPLACEMENT OF ANY NON-CONFORMING PRODUCTS, PLUS PAYMENT BY COMPANY TO DISTRIBUTOR OF A HANDLING FEE EQUAL TO 10% OF THE PRICE PAID BY DISTRIBUTOR TO COMPANY FOR SUCH NON-CONFORMING PRODUCTS. EXCEPT TO THE EXTENT OTHERWISE PROVIDED IN THE PRECEDING SENTENCE, UNDER NO CIRCUMSTANCES SHALL DISTRIBUTOR BE ENTITLED TO RECOVER ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES IN RESPECT OF ANY CLAIMS FOR BREACH OF WARRANTY AGAINST COMPANY HEREUNDER.

10.    **Termination.**

    a.    **Immediate Termination of Agreement.**

Company shall have the absolute right to terminate this Agreement, without thereby incurring any liability to Distributor, effective immediately upon or any time after the occurrence of any of the following events:

    i.    Distributor's commission of any act of dishonesty towards Company or any customer serviced by Distributor.

    ii.    Distributor's failure to pay any amount due and payable to Company within five days after receiving Company's written demand therefor.

    iii.    Distributor's breach of any of the provisions of Subsection 7(c), Subsection 7(e), or Subsection 7(f) hereof.

Initials _____

Initials _____



# STORE DOOR DISTRIBUTOR AGREEMENT

iv.    Distributor's failure to provide Adequate Service to any Material Customer which is serviced by Distributor hereunder (as, for example, Distributor's failure to service any such customer on any day on which such customer reasonably expects or requests to be serviced), which failure continues without cure for a period of 48 hours after Distributor's receipt of oral or written notice thereof from Company or is followed by another failure (whether or not similar, and whether or not involving the same Material Customer) within nine months after Distributor's receipt of any such oral or written notice.

v.    Distributor's failure to comply fully with the provisions of Subsection 7(h) hereof, which failure continues without cure for a period of 48 hours after Distributor's receipt of oral or written notice thereof from Company or is followed by another failure (whether or not similar) within nine months after Distributor's receipt of any such oral or written notice.

vi.    Distributor's breach of any other term or provision of this Agreement, which breach continues without cure for a period of seven days after Distributor's receipt of written notice thereof from Company or recurs within six months after Distributor's receipt of any such written notice.

vii.    The refusal by any Material Customer willing to accept Store Door distribution of the Products from another of Company's distributors to accept Store Door distribution and purchase of the Products from Distributor.

viii    The expiration of 90 days following the death, legal incompetence, dissolution, insolvency, bankruptcy, or making of a general assignment for the benefit of creditors of or by Distributor, any holder of in excess of a 25% equity interest in Distributor, or any guarantor of any obligations of Distributor under this Agreement without Distributor (or Distributor's personal representative, conservator, trustee, debtor-in-possession, or other representative) having effected an assignment of Distributor's rights and obligations hereunder to a third party in accordance with the provisions of Section 13 hereof.

ix.    The breach by any guarantor of any obligations of Distributor hereunder of any representations, warranties, or obligations set forth in any such guarantee, or the revocation by any such guarantor (other than in connection with or as a consequence of the death, dissolution, legal incompetence, bankruptcy, or making of a general assignment for the benefit of creditors of or by such guarantor) of any such guarantee.

x.    Company's ceasing to distribute the Products within the Facility Service Area on a Store Door basis.

xi.    Company's changeover, for any reason, of Company's primary method of Store Door distribution of the Products within the Facility Service Area from independent distributors to Company employee drivers.

xii.    A determination by a court, the Internal Revenue Service, or other tribunal or governmental agency that Distributor and/or other Company distributors similarly situated are employees, rather than independent contractors, or a change in applicable laws, regulations, or agency interpretations to similar effect.

1002 – Ap#550 - CityWide Consultants Food Management LLC

XX-XXX7382

Initials_____

Initials_____



# STORE DOOR DISTRIBUTOR AGREEMENT

xiii.    Any assignment (or purported assignment) of Distributor's rights or obligations hereunder which does not comply with the provisions of Section 13 hereof.

b.    <u>Termination of Agreement Without Cause.</u>

Either party shall have the absolute right to terminate this Agreement without cause, and without thereby incurring any liability to the other party, upon 30 days' prior written notice to the other party, except that should Company exercise such right, Company shall thereupon become obligated to pay to Distributor, in cash, within 30 days after the date of termination, an amount equal to the excess (if any) of (i) the Formula Value as of the date of Company's notice to Distributor over (ii) the Initial Formula Value.

c.    <u>Obligations of Distributor upon Termination.</u>

Upon any termination (for any reason) of this Agreement, Distributor shall return or cause to be returned to Company all equipment, decals, advertising materials, promotional items, and similar materials (other than materials which, at the time of termination, are being used at customer locations) furnished by Company in connection with this Agreement and not previously returned to Company or expended in sales activities. Further, Company may, at its option, purchase any Products then in Distributor's possession and in saleable condition at the same prices as were charged to Distributor upon Distributor's purchase of same from Company. Company shall pay for any such Products so repurchased from Distributor either with cash or by crediting the purchase price against any obligations then owing to Company by Distributor.

## 11.    Relationship Created.

Distributor agrees that he or she is not an employee of Company for any purpose, but is an independent sales and distribution contractor. Company is interested only in the results obtained by Distributor, who shall (except to the extent otherwise expressly provided herein) have sole control over the manner and means of performing under this Agreement. Company shall not have the right to require Distributor (or any Distributor's Representative) to conform to any fixed or minimum hours devoted to selling efforts, follow prescribed itineraries, wear a uniform, display the Marks or any Company logos on Distributor's vehicles, accept training from Company, or meet sales quotas. All expenses and disbursements, including, without limitation, expenses for the purchase, maintenance, and operation of Distributor's delivery vehicles, travel and entertainment, office and clerical costs, rental of warehouse space, and general selling expenses which shall be incurred by Distributor in connection with this Agreement, as well as (subject to the terms of Section 9 hereof) all costs associated with Stales or Unsaleables, shall be borne wholly and completely by Distributor, and Company shall not in any way be responsible or liable therefor. Except to the extent otherwise expressly provided herein, Distributor shall not have, and shall not claim to have, any right, power, or in the name of, or binding upon Company, or to pledge Company's credit or to extend credit in Company's name. Distributor shall, at Distributor's sole expense, obtain and keep in effect any business licenses or permits required by law for the performance of Distributor's obligations hereunder

and shall provide Company with copies of same at any time and from time to time at Company's request. Distributor shall in no event purport to be an employee of Company, but shall under all appropriate circumstances make it clear to interested parties that Distributor is an independent contractor. Distributor shall be solely responsible for paying all of Distributor's income taxes (including estimated taxes), Social Security taxes (including self-employment taxes), payroll taxes, business taxes, and any other taxes or similar obligations which may be incurred in connection with Distributor's performance under this Agreement, including, without limitation, in connection with Distributor's retaining of any Distributor's Representatives to assist Distributor in performing Distributor's obligations hereunder.

1002 – Ap#550 - CityWide Consultants Food
Management LLC
XX-XXX7382

Initials _____

Initials _____

**EXHIBIT B, PAGE 28**

 **STORE DOOR DISTRIBUTOR AGREEMENT**

12.    **Proprietary Rights.**

The parties acknowledge and agree that over the years, Company has expended considerable money, time, and effort in building up the goodwill of the business associated with the Marks and the artwork, titles, expressions, and trade dress associated therewith (collectively, Company's "Proprietary Rights"). Throughout the term of this Agreement, and subject to the terms and conditions hereof and such rules and procedures as Company may adopt from time to time, Distributor may use Company's Proprietary Rights on any uniforms, vehicles, signs, promotional materials, or related items used or made by Distributor in connection with the promotion or sale of the Products hereunder.  Distributor confirms that Distributor neither has nor will take by virtue of this Agreement any right, title, or interest in or to Company's Proprietary Rights or any registrations thereof, or any right or license to use Company's Proprietary Rights, save only the right of use set forth in the preceding sentence.  Immediately upon any termination of this Agreement, Distributor shall remove any logos, signs, or decals  from any vehicles used by Distributor which reflect any of Company's Proprietary Rights, shall cease all other use of Company's Proprietary Rights, and shall not thereafter use any of Company's Proprietary Rights or any other trademarks, artwork, titles, expressions, or trade dress so nearly resembling any portion of Company's Proprietary Rights as would be likely to lead to confusion or uncertainty or to deceive the public.

13.    **Assignment.**

The rights and obligations of Distributor hereunder may not be assigned or delegated, except to the extent that delegation of Distributor's obligations to Distributor's Representatives is permitted pursuant to Section 6 hereof, and except to the extent otherwise consented to in writing by Company.  In this connection, Company agrees that it will not unreasonably withhold its consent to Distributor's assignment of all (but not less than all) of Distributor's rights and obligations hereunder to a third party, provided that such consent may be made contingent upon (i) Company's being supplied with adequate information regarding the proposed assignee's background, experience, and financial status; (ii) the proposed assignee's meeting of such reasonable distributor suitability standards as Company shall impose from time to time; (iii) Distributor's payment of all indebtedness owing by Distributor to Company at the time of the proposed assignment, whether under this Agreement or otherwise, and whether or not then due and payable; (iv) the execution and delivery to Company by the proposed assignee of Company's standard Store Door Distributor Agreement which is then being offered to new Store Door distributors of the Products servicing the Facility Service Area, which Agreement shall set forth terms and conditions similar to the terms and conditions of this Agreement as then in effect (including, without limitation, identifying as the Eligible Customers the same customers which are then Eligible Customers hereunder and specifying as the Initial Formula Value the identical amount which is set forth in Subsection 1(j) hereof) but need not be identical to this Agreement in all respects; (v) the execution and delivery to Company by Distributor and the proposed assignee of a letter agreement acknowledging that Company has made no representations or warranties to the proposed assignee, acknowledging that Company shall not be liable to either Distributor or the proposed assignee in respect of any misrepresentations, breaches of warranty, failures to disclose material information, failures to make payments, or other breaches or misconduct by either Distributor or the proposed assignee arising out of or relating to the assignment of Distributor's rights hereunder to the proposed assignee, and setting forth such other terms and provisions for Company's protection as shall reasonably be requested by Company; (vi) the execution and delivery to Company by the proposed assignee of an instrument in form and substance reasonably satisfactory to Company memorializing the proposed assignee's assumption then in effect between Company and Distributor;

1002 – Ap#550 - CityWide Consultants Food Management LLC

XX-XXX7382

Initials_____

Initials_____

**EXHIBIT B, PAGE 29**



# STORE DOOR DISTRIBUTOR AGREEMENT

(vii) the making by Distributor and the proposed assignee of arrangements reasonably satisfactory to Company for the orderly transition of the Eligible Customers from Distributor to the proposed assignee, including, without limitation, arrangements for Distributor and the proposed assignee to service the Eligible Customers jointly for a transition period of not less than two weeks; (viii) the determination by Company that the proposed assignee (if already a Company distributor) will not, upon the proposed assignee's acquisition of Distributor's rights hereunder, either alone or in conjunction with any affiliated persons or entities, control sales of Company products (including, without limitation, the Products) in excess of $1,000,000 per annum (calculated on the basis of net invoice price to the proposed assignee's customers, as reasonably estimated by Company); (ix) the execution and delivery to Company of guarantees of the obligations of the proposed assignee to Company by the proposed assignee's shareholder(s) or other owner(s) (in the event that the proposed assignee is not a physical person); (x) the proposed assignment being made in conjunction with the transfer of all of Distributor's distribution business (as opposed to, for example, solely the part of such business which relates to distribution of the Products) to the proposed assignee; and/or (xi) such other reasonable requirements as Company shall impose from time to time. For purposes of this Agreement (including, without limitation, for purposes of Clause (xiii) of Subsection 10(a) hereof and for purposes of this Section 13), if Distributor is a corporation, partnership, or other entity (other than a physical person), any transfer or series of transfers (whether or not related) of equity interests in Distributor totaling in excess of 25% of the total equity interests in Distributor (exclusive of any transfers resulting from the death, legal incompetence, dissolution, insolvency, bankruptcy, or making of a general assignment for the benefit of creditors of or by any holders of equity interests in Distributor) shall be deemed an assignment of Distributor's rights and obligations hereunder.

14. **Additional Terms.**

Any additional terms set forth on Exhibit C hereto shall form a part of this Agreement and shall supersede any conflicting provisions set forth in the body hereof.

15. **General Terms.**

a. **Notices.**

Except to the extent oral notices are expressly permitted herein, any notice, request, demand, or other communication required or permitted to be given under this Agreement shall be in writing and shall be sufficiently given if delivered personally or sent by first-class mail, postage prepaid, to the business address of the party receiving notice which is set forth on the signature page to this Agreement. Any such notice shall be deemed effective as of the date personally delivered or as of three days after such notice is deposited in the United States mail, as the case may be. Either party may change such party's address for purposes of this Agreement by written notice given to the other party in accordance with the terms of this Subsection 15(a).

b. **Entire Agreement; Amendment.**

This Agreement constitutes the entire agreement between the parties concerning the Store Door distribution of the Products to the Eligible Customers and supersedes all prior and contemporaneous agreements between the parties relating to such subject matter (including, without limitation, any jobber or distributor agreement previously entered into between or binding upon the parties hereto which relates to the Store Door distribution of the Products to the Eligible Customers, whether oral or in writing). Neither party is relying upon any warranties, representations, or inducements not set forth herein. This Agreement may be

1002 – Ap#550 - CityWide Consultants Food Management LLC
XX-XXX7382

Initials_____

Initials_____

EXHIBIT B, PAGE 30



# STORE DOOR DISTRIBUTOR AGREEMENT

amended only by an instrument in writing signed by both parties which expressly refers to this Agreement and specifically states that it is intended to amend it. However, Distributor agrees not to unreasonably withhold Distributor's written consent to any amendment to this Agreement proposed by Company to Distributor and to all other Company Store Door distributors of the Products servicing the Facility Service Area who are similarly situated, so long as such amendment does not have a material adverse effect upon Distributor's rights or obligations hereunder.

c.  <u>Controlling Agreement.</u>

In the event of any conflict between the provisions of this Agreement and the provisions contained in any order form, invoice, or other form used by Company or by Distributor, the provisions of this Agreement shall control.

d.  <u>Severability.</u>

If for any reason any one or more of the provisions of this Agreement shall be held to be inoperative, unenforceable, or invalid, as applied to any particular case or in all cases, such circumstance shall not have the effect of rendering such provision inoperative, unenforceable, or invalid in any other case or of rendering any of the other provisions of this Agreement inoperative, unenforceable, or invalid.

e.  <u>Number and Gender.</u>

All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, or neuter and to the singular or plural as the identity of the person or persons, firm or firms, or corporation or corporations referred to may require.

f.  <u>Waiver.</u>

No term or provision hereof shall be deemed waived, and no breach excused, by failure of either party to insist in any instance upon strict performance of any term or condition of this Agreement, unless such waiver or consent shall be in writing and signed by the party claimed to have waived or consented. Any consent by either party to, or waiver of, a breach by the other, whether express or implied, shall not constitute consent to, waiver of, or excuse for any different or subsequent breach.

g.  <u>Disclaimer and Waiver of Extraordinary Claims.</u>

The parties recognize that their relationship is one of ordinary commerce involving a course of dealing between two individual businesses and that disputes are best resolved while recollections are fresh. The parties further recognize and agree that the prompt and efficient resolution of their business dispute would be frustrated by the delay, expense and complication of simultaneously considering claims involving other distributors and persons or extraordinary relief.

**<u>Accordingly, the parties mutually disclaim and waive the right to pursue against one another (1) any class action claims or causes of action of whatever nature, or (2) any claims or causes of action seeking punitive or treble damages.</u>**

1002 – Ap#550 - CityWide Consultants Food Management LLC
XX-XXX7382

Initials _____

Initials _____

EXHIBIT B, PAGE 31

 # STORE DOOR DISTRIBUTOR AGREEMENT

h.    Contractual Limitation of Actions.

**The Parties agree that any claim or cause of action which came into existence, more than two years prior to the earlier of commencement of arbitration or filing of litigation in court is barred.**

i.    Arbitration.

i.    Injunctions.

Subject to the disclaimer and waiver in Subsection 15(g), claims or causes of action solely for injunctive relief (and not joined to any claims for damages or monetary relief) may be sought in a court of law or by arbitration.

ii    Non-Class Claims.

Subject to the disclaimer and waiver in Subsection 15(g), the bar of claims older than two years in Subsection 15(h), and the conditional limitation in Subsection 15(h)(iii), any and all other claims and causes of action arising out of or relating to this Agreement (including, without limitation, matters relating to this Subsection 15(i) regarding arbitration, matters relating to performance, breach, interpretation, meaning, construction, or enforceability of all or any part of this Agreement, and all claims for rescission or fraud in the inducement of this Agreement) shall be resolved by arbitration through J·A·M·S/Endispute ("JAMS") as provided in Subsection 15(i)(iii) below.

iii    Class Claims.

In the event that the parties' disclaimer and waiver in Subsection 15(g) of the right to assert class action claims and causes of action against one another is not legally enforceable, any and all claims and causes of action arising out of or relating to this Agreement (including, without limitation, matters relating to this Subsection 15(i) regarding arbitration, matters relating to performance, breach, interpretation, meaning, construction, or enforceability of all or any part of this Agreement, and all claims for rescission or fraud in the inducement of this Agreement) asserted as a class action under Federal Rule of Civil Procedure 23, any similar state statute or rule of judicial procedure, or any equivalent arbitration procedure shall be filed first in a court of law of competent jurisdiction (which shall be in Dallas County if the claims or causes of action involve in whole or in part one or more of the Company's Facilities located in Texas or a Company policy administered in whole or in part from the Company's headquarters in Texas; otherwise the court shall be located within the State and County where the affected Company's Facility is located). All proceedings prior to and including a decision as to whether the alleged class will be certified (including without limitation any decisions on discovery motions or motions for dismissal or summary judgment prior to a class certification hearing) shall be judicially determined by the court, and where applicable reviewed by the appellate court(s). Once a judicial decision has been made as to class certification, the claims and causes of action shall be referred to and resolved by arbitration through J·A·M·S/Endispute ("JAMS"), consistent with the judicial ruling(s) and decision(s) theretofore made.

1002 -- Ap#550 - CityWide Consultants Food
Management LLC
XX-XXX7382

Initials_____

Initials_____

EXHIBIT B, PAGE 32



# STORE DOOR DISTRIBUTOR AGREEMENT

iv    <u>Arbitration Procedures.</u>

All arbitration proceedings, once properly commenced, shall proceed pursuant to JAMS Streamlined Arbitration Rules and Procedures ("JAMS Streamlined Rules") or such other rules as JAMS may then decide are applicable. The parties have deliberately selected the JAMS Streamlined Rules because they contemplate a quick, inexpensive and binding resolution of their individual claims and business disputes while memories are fresh. Arbitration shall take place at the location (which shall be in Dallas County if the controversies, disputes, or claims involve in whole or in part one or more of the Company's Facilities located in Texas or a Company policy administered in whole or in part from the Company's headquarters in Texas; otherwise the location shall be within the State and County where the affected Company's Facility is located) and time set by JAMS, regardless of whether one side to the dispute or controversy fails or refuses to participate.The parties further agree that in any such proceeding they may seek and obtain discovery as permitted by applicable law, which applicable law is incorporated herein and the rights of the parties thereunder are subject to enforcement by JAMS.

Said arbitration shall be conducted and subject to the provisions of applicable law, and the arbitrator(s) shall be entitled to grant any remedy or relief, subject to the limitations in Subsection 15(g), which a party would be entitled to receive under applicable law in a judicial proceeding. The fees of the arbitrator(s) shall be borne equally by Distributor and Company, unless the Distributor makes a sufficient in forma pauperis showing that the Distributor cannot proceed unless the Company pays some or all of the Distributor's portion of the fees; any of the Distributor's portion of the fees of the arbitrator(s) which is paid by Company shall be awarded to Company as costs recoverable against the Distributor in the event Distributor does not prevail in the arbitration. In the event JAMS is not in existence at the time or location required hereunder, the arbitration shall be conducted before the American Arbitration Association ("AAA") pursuant to its rules for resolution of commercial disputes or other AAA applicable rules.

v    <u>Judicial Review of Arbitration Award.</u>

In the event that the amount in controversy in arbitration exceeds $100,000, the parties shall have the right to have any arbitration award judicially reviewed by the courts of law as fully as would be allowed in the review of a decision of a master under Federal Rule of Civil Procedure 53, with findings of fact to be reviewed for clear error and issues of law to be decided de novo by the courts. In the event that the amount in controversy in arbitration is less than $100,000, the arbitration award shall be judicially reviewable by the courts of law under the law generally applicable to an arbitration award.

j.    <u>Performance Excused.</u>

Anything to the contrary herein notwithstanding, Company shall not be liable for any delay or failure to perform any of the terms or provisions of this Agreement if the delay or failure is caused by government restrictions or regulations, transportation conditions, labor or material shortages, labor disputes, strikes, wars, riots, insurrections, fires, floods, storms, accidents, acts of God, failures of crops or supplies, or any other causes beyond Company's reasonable control.

1002 – Ap#550 - CityWide Consultants Food Management LLC
XX-XXX7382

Initials_____

Initials_____

**EXHIBIT B, PAGE 33**

 # STORE DOOR DISTRIBUTOR AGREEMENT

k.   Governing Law.

This Agreement shall be governed by and construed in accordance with the laws of the State of Texas.  The Federal Arbitration Act, 9 U.S.C. § 1 et seq. shall also apply as needed to uphold the validity or enforceability of the arbitration provisions of this Agreement.

l.   Translation.

This Agreement may be translated into Spanish or any other foreign language.  However, the English version hereof shall be controlling.

m.   Agreement Fully Understood.

Distributor acknowledges and represents that Distributor voluntarily and knowingly executed this Agreement after Distributor had the opportunity to consult with Distributor's own legal counsel.  Distributor represents that Distributor knows and fully understands the contents of this Agreement and agrees to abide by all terms and conditions herein.

Initials_____

Initials_____

EXHIBIT B, PAGE 34

 **STORE DOOR DISTRIBUTOR AGREEMENT**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the day and year first above written.

Approved By: 1002-Ron Brunner (Div Mgr) (3/24/2008 4:44:15 PM )

"COMPANY"

GRUMA Corporation, a Nevada corporation d/b/a Mission Foods, Guerrero Mexican Food Products, etc.

("COMPANY")

By:

Name: _Ember Gutierrez_

Title: _Area Sales Manager_

Business Address:

9121 Pittsburgh Ave
Suite 102 Rancho
Cucamonga 91730

"DISTRIBUTOR"

CityWide Consultants Food Management LLC a  Corporation (Distributor) TAX ID: XX-XXX7382 .

By: _____

Name: _____

Title: _____

Business Address:

14895 White Box Ln
Moreno Valley , CA 92555

4/7/2008

**Page 22 of 30**

1002 -- Ap#550 - CityWide Consultants Food Management LLC
XX-XXX7382

Initials_____

Initials_____

**EXHIBIT B, PAGE 35**

 **STORE DOOR DISTRIBUTOR AGREEMENT**

EXHIBIT A-1

DESCRIPTION OF TERRITORY

**In The State of:**

CALIFORNIA

**In The Counties of:**

RIVERSIDE

**In The Cities of:**

MORENO VALLEY

**Within The Boundaries of:**

TO THE "NORTH" OF: ALESSANDRO BLVD
TO THE "SOUTH" OF: IRIS AVE
TO THE "WEST" OF: 215 FWY
TO THE "EAST" OF: LASSELLE ST

**Store List:**

| | Store Name | Address | City | State | Zipcode |
|---|---|---|---|---|---|
| 1 | CARDENAS #22 | 14930 PERRIS BL | Moreno Valley | CA | 92553 |
| 2 | FOOD 4 LESS #0398 | 2444 ALESSANDRO BLVD. | Moreno Valley | CA | 92553 |
| 3 | LONGS DRUGS #224 | 25070 ALESSANDRO BLVD | Moreno Valley | CA | 92553 |
| 4 | LONGS DRUGS #515 | 26180 IRIS AV | San Jacinto | CA | 92583 |
| 5 | MARCH AFB /HQCKLY /CALL #102 | ACCT FIN BLDG 466 | March Air Reserve Base | CA | 92518 |
| 6 | SMART & FINAL #0475 | 14490 NEWHOPE | Moreno Valley | CA | 92553 |
| 7 | STATER BROS. #137 DLY | 11750 E WHITTIER BLVD | Whittier | CA | 90601 |
| 8 | STATER BROS. #172 GCY | 25900 IRIS AVENUE | Moreno Valley | CA | 92551 |

Initials _____

Initials _____

1002 – Ap#550 - CityWide Consultants Food
Management LLC
XX-XXX7382

EXHIBIT B, PAGE 36

 **STORE DOOR DISTRIBUTOR AGREEMENT**

EXHIBIT A-2

EXCLUDED CUSTOMERS

ALL FOOD SERVICE CUSTOMERS
CUSTOMERS UNDER THE GUERRERO AND MAIZAL LABELS BEING SERVICE BY THIRD
PARTIES, INCLUDING PICK UP DISTRIBUTORS, AT THE TIME OF EXECUTION OF THIS
AGREEMENT.

4/7/2008                 1002 – Ap#550 - CityWide Consultants Food
                                    Management LLC
Page 24 of 30                    XX-XXX7382

Initials_____
Initials_____

EXHIBIT B, PAGE 37

 **STORE DOOR DISTRIBUTOR AGREEMENT**

### EXHIBIT A-3

### ADDITIONAL CUSTOMER

MARCH AFB
ACC FIN BLDG 466
MARCH AIR RESERVE, 92518

4/7/2008

**Page 25 of 30**

1002 – Ap#550 - CityWide Consultants Food
Management LLC
XX-XXX7382

Initials_____

Initials_____

**EXHIBIT B, PAGE 38**

 **STORE DOOR DISTRIBUTOR AGREEMENT**

### EXHIBIT A-4

### MARKS

Calidad

Cardenas

Guerrero

Mission

Pace Salsa

Montecito Tortillas and Chips

Kroger

Kettle Chips

DRD/La Fiesta

4/7/2008

**Page 26 of 30**

1002 – Ap#550 - CityWide Consultants Food Management LLC

XX-XXX7382

Initials_____

Initials_____

**EXHIBIT B, PAGE 39**

 **STORE DOOR DISTRIBUTOR AGREEMENT**

---

### EXHIBIT B

#### SUGGESTED DISTRIBUTOR MARK-UPS

**Region Name: SoCal Out Of Town**

|  | Permanent |
|---|---|
| Manufactured and related proprietary tortillas, shells and chips | 26.58% |
| All related other purchased and Club pack items | 21.95% |
| La Fiesta DRD | 19.05% |
| All others and private labeled products | 17.65% |
| Lender Bagels | 28.21% |
| Beef Jerky | 13.64% |
| Calidad Products | 16.28% |

The above mentioned Markups translate to the following Discount Rate:

**Margin Discount**

**Region Name: SoCal Out Of Town**

|  | Permanent |
|---|---|
| Manufactured and related proprietary tortillas, shells and chips | 21.00 |
| All related other purchased and Club pack items | 18.00 |
| La Fiesta DRD | 16.00 |
| All others and private labeled products | 15.00 |
| Lender Bagels | 22.00 |
| Beef Jerky | 12.00 |
| Calidad Products | 14.00 |

1002 -- Ap#550 - CityWide Consultants Food Management LLC
XX-XXX7382

Initials _____

Initials _____

**EXHIBIT B, PAGE 40**

 **STORE DOOR DISTRIBUTOR AGREEMENT**

**EXHIBIT C**

**ADDITIONAL TERMS**

THE MISSION BRAND CAN BE SOLD TO ALL YOUR CUSTOMERS WITHIN YOUR FOUR CORNER BOUNDERIES AND CUSTOMER LIST.

THE GUERRERO BRAND CAN BE SOLD ONLY TO THE FOLLOWING ACCOUNTS.

MARCH AIR FORCE BASE
ACCT FIN BLDG 466
MARCH AIR FORCE RESERVE, 92518

LONGS DRUGS #224
25070 ALESSANDRO BLVD
MORENO VALLEY, CA 92551

LONGS DRUGS #515
28180 IRIS AVE
MORENO VALLEY, CA 92551

4/7/2008

**Page 28 of 30**

1002 – Ap#550 - CityWide Consultants Food Management LLC
XX-XXX7382

Initials_____

Initials_____

**EXHIBIT B, PAGE 41**

 **STORE DOOR DISTRIBUTOR AGREEMENT**

**EXHIBIT D**

**AMENDMENT TO THE STORE DOOR DISTRIBUTOR AGREEMENT**

This amendment is made an entered into effective as of ___4 / 17 / 08___ and between Gruma Corporation ("Company") and CityWide Consultants Food Management LLC Distributor.

**RECITALS**

WHEREAS, Company and Distributor entered into a Store Door Distributor Agreement dated ___4 / 17 / 08___

WHEREAS, Company and Distributor now desire to amend the Agreement in certain respects; NOW THEREFORE, the parties hereby agree as follows:

**AGREEMENT**

1.  **Definitions.**     All capitalized terms not otherwise defined herein, shall have the same meaning ascribed to them in the Agreement.

2.  **Insurance.**     Distributor shall at all times keep the following types of insurance:

    (a)     **Vehicle Insurance.**

    Distributor shall maintain valid commercial automobile liability insurance satisfactory to Company in an amount of not less than $1,000,000 combined single limit, comprehensive and collision damage, hired auto and non-owned auto coverage for each vehicle (whether owned, non-owned, hired, rented or borrowed) used by Distributor and Distributor's Representatives for the delivery of Products to Eligible Customers. Distributor shall ensure that at all times Company is provided with a current certificate of insurance under each such policy naming Company as an additional insured. Company must receive written notice of any policy cancellation at least 30 days in advance.

    (b)     **General Liability Insurance.**

    Distributor shall maintain valid general liability insurance (including Products) satisfactory to Company for Distributor and Distributor's Representatives for the delivery of Products to Eligible Customers in an amount of not less than $1,000,000 per occurrence and $2,000,000 aggregate. Distributors shall ensure that at all times Company is provided with a current certificate of insurance under each such policy naming Company as an additional insured. Company must receive written notice of any policy cancellation at least 30 days in advance.

    (c)     **Inland Marine Insurance.**

    Distributor shall maintain inland marine insurance satisfactory to Company in an amount of $5,000 for cargo and $5,000 for each handheld computer provided to Distributor or Distributor's Representatives for the delivery of Products to Eligible Customers. Distributor shall ensure that at all times Company is provided with a current certificate of insurance under each such policy naming Company as an additional insured. Company must receive written notice of any cancellation at least 30 days in advance.

    (d)     **Workers' Compensation Insurance.**

    Distributors are independent contractors and are not employees of Company for any purpose whatsoever per the terms of the Agreement. Independent distributors and any employees of said distributors are responsible for their own Workers' Compensation/Employers' Liability insurance and/or benefits, if any.

The provisions of this Agreement shall supersede the provision of the Agreement to the extent inconsistent herewith. Subject to the foregoing, the Agreement shall remain in full force and effect as currently written.

("Company")                          ("Distributor")

4/7/2008          1002 – Ap#550 - CityWide Consultants Food          Initials_____
                           Management LLC
**Page 29 of 30**          XX-XXX7382          Initials_____



# DISTRIBUTOR ARBITRATION OPT-OUT FORM

### DISTRIBUTOR ARBITRATION OPT-OUT FORM

Location: _Rancho Cac,_ California

I understand that the Store Door Distribution Agreement ("SDDA") provides for mandatory arbitration of disputes between Gruma Corporation and myself before a private arbitrator. Arbitration is intended to be a private and hopefully less expensive way to have disputes decided. I understand I will have the right to be involved in selecting an impartial arbitrator to hear the dispute.

I also understand that I have 30 days after I sign the SDDA to choose to opt out of the choice of arbitration as the way for having disputes decided. If I opt out, any disputes will be resolved in open court before a judge, and where applicable, a jury. I understand that a judge will be assigned to the case without my being consulted.

In either arbitration or in open court, both sides can use attorneys, subpoena witnesses and documents, and have their dispute decided based on the state and federal laws which apply to the dispute.

I understand that I do not need to do anything further at this time unless I wish to have disputes decided in open court rather than private arbitration.

• • • •

If I wish to have disputes decided in open court, I should return this form with a check mark in the box indicating my choice not to use private arbitration. The form should be mailed by certified mail to

General Counsel

Gruma Corporation

1159 Cottonwood Lane

Suite 200

Irving Texas 75038

Gruma Corporation will acknowledge receipt of my election within 15 calendar days after receiving this form. If I mail this form and do not receive acknowledgement from Gruma Corporation within 15 calendar days, I should call the General Counsel at 972-232-5000.

Sending this form does not cause the SDDA to be terminated.

☐ I elect to have disputes resolved in open court rather than by private arbitration.

Signature: _____  Date: _4/7/08_

PLEASE PRINT NAME & HOME ADDRESS

Name: _Larry Gymus_

Title: _Operator / Owner_

Street Address: _14895 White Box LN_

City: _Moreno Valley_    State: _CA_    Zip: _92555_

4/7/2008        1002 -- Ap#550 - CityWide Consultants Food        Initials _____
                Management LLC
Page 30 of 30        XX-XXX7382        Initials _____